IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| JOHN ALLEN MUHAMMAD, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No.  1:07CV1022 |
| | ) | |
| LORETTA K. KELLY, Warden, | ) | |
| Sussex I State Prison, | ) | |
| Respondent. | ) | |

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2254

COMES NOW the Petitioner John Allen Muhammad, by and through counsel James G. Connell, III, and Jonathan P. Sheldon, and petitions this honorable Court for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254.  Pursuant to this Court's order of January 22, 2008 (Docket # 38), Mr. Muhammad files this amended petition with leave for good cause shown.[1]

An examination of the extensive record in *Commonwealth v. John Allen Muhammad* reveals a mentally ill client and two extraordinary attorneys struggling against difficult odds. The difficulty came not only from the notoriety of the crime, but from the environment created by the Commonwealth: prosecution on a minimalist indictment, in part under the untested terrorism statute; discovery rules which allowed the Commonwealth to suppress thousands of

---

[1] To avoid the confusion inherent in citation to record documents by name instead of number and to allow easy reference, all citations in this petition will refer to one of three sources.  "J.A." refers to the Joint Appendix prepared in the Supreme Court of Virginia on direct appeal. "F.H.A." refers to the Federal *Habeas* Appendix filed contemporaneously with this Petition, which replaces the prior Federal *Habeas* Appendix.  "S.F.H.A." refers to the Sealed Federal *Habeas* Appendix filed contemporaneously with this Petition.  The F.H.A. includes documents filed in the Virginia Supreme Court separately from the Joint Appendix, including the pleadings on direct appeal and state *habeas* review.

pages of relevant documents, including critical *Brady* evidence; and the advantage of taking the contradictory positions that Mr. Muhammad controlled Lee Malvo in the Prince William County trial, but that Mr. Muhammad did not in the Fairfax County trial. Perhaps from a sense of loyalty to the client, these two superlative attorneys did not inform the trial court of Mr. Muhammad's incompetence to represent himself when he asked the trial court to discharge them. Most importantly, the trial court eviscerated the mitigation case that the attorneys had painstakingly prepared by excluding all defense expert evidence from the penalty phase of the trial.

Even after the advent of the Antiterrorism and Effective Death Penalty Act, the ancient writ of habeas corpus lies to correct constitutional violations by the state courts. Having exhausted his state court remedies, Mr. Muhammad respectfully asks this Court, in due course and after an evidentiary hearing, to issue the writ and require Virginia to grant him a new trial and penalty phase.

EXHAUSTED CLAIMS[2]

I.   THE TRIAL COURT UNCONSTITUTIONALLY EXCLUDED MR. MUHAMMAD'S EXPERT TESTIMONY IN THE PENALTY PHASE.

Consistent with their duty to present a strong mitigation case, Mr. Muhammad's attorneys developed a powerful, persuasive narrative for life centered on the expert testimony of Dr. Mark Cunningham. Although the attorneys explained that Dr. Cunningham would not rely on any statement by Mr. Muhammad in his testimony, the trial court excluded all defense expert testimony in the penalty phase as a sanction for Mr. Muhammad's refusal to submit to an

---

[2] Pursuant to this Court's Order of October 26, 2007 (Docket # 9), Petitioner includes a section captioned "Exhausted Claims." All claims in this Petition have been presented to the Supreme Court of Virginia. Where the Supreme Court of Virginia addressed a subpart of a claim on procedural grounds, that resolution is identified.

interview by Dr. Park Dietz.  The trial court's ruling, which eviscerated the mitigation case and resulted in a death sentence, violated both the Eighth Amendment principles of *Eddings v. Oklahoma*, 455 U.S. 104 (1982) and the Fifth and Sixth Amendment principles of *Taylor v. Illinois*, 484 U.S. 415 (1988).

*The early mitigation investigation*

In March 2003, Mr. Greenspun and Mr. Shapiro contacted mitigation specialist Joe Guastaferro in the hopes of retaining him, and provided him information about the case.  F.H.A. 1319-20.  On March 21, 2003, Mr. Muhammad moved the trial court to appoint mental health experts and private investigators, including Dr. William Stejskal, Dr. Eileen Ryan, and Joe Guastaferro, to assist the accused and counsel with the potential presentation of information related to Mr. Muhammad's history, character, or mental condition.  1 J.A. 52-54; 1 J.A. 56-60; S.F.H.A. 1-4.  The trial court granted Mr. Muhammad's request for funding for Dr. Stejskal and Dr. Ryan on March 27, 2003, and, after some delay, granted funding for mitigation and fact investigators.  1 J.A. 83-168, 279; 2 J.A. 718; 7 J.A. 2714-15, 2721, 2751-52, 2760; S.F.H.A. 32-36.

The investigators' work bore fruit, and yielded substantial evidence of the "living hell" Mr. Muhammad suffered as a child.  Investigator Jason Milam continued to interview Edward Williams to develop the picture of Mr. Muhammad's childhood in greater depth; Edward graphically described the regular beatings Mr. Muhammad's grandfather Felton Holiday and others would give Mr. Muhammad and the other children, using hosepipes, hammers, or their closed fists.  Edward reported that he experienced a lot of problems as an adult as a result of his treatment as a child, including continual anger.  F.H.A. 1472-76.

3

The interviews of Edward led to other family members.  For example, Milam interviewed Muhammad's sister Aurolyn Williams in August 2003.  She explained that Mr. Muhammad and his siblings would have been much better off if they had gone into the foster care system.  She described incredible neglect:  Their aunt Annie, charged with taking care of the children, would leave the young children at home alone without food.  The children always had second-hand clothing and shoes with holes in them.  No one would take the children to the dentist, and they would cry with the pain of their cavities.  The children got peas or beans every day, and were not allowed to open the refrigerator.  She explained, "All they gave us was a roof over our heads, nothing more."  But her description of the abuse was even more horrific: whippings with hose pipes, electric cords, sticks and hands almost daily.  Annie would take the mouthpiece out of the telephone so that the children could hear her directions when she called, but could not call for help or respond to people calling.  F.H.A. 1468-71.

*The involvement of Dr. Cunningham*

Although Mr. Greenspun and Mr. Shapiro had contacted Dr. Mark Cunningham as early as June 2003, by late summer 2003, they had elected to rely on him as the centerpiece of their mitigation presentation.  The attorneys concluded that an analysis of objective and historical mitigating factors, such as Dr. Cunningham could provide, would be most persuasive to a jury.

Accordingly, when Mr. Muhammad gave his notice of expert testimony pursuant to Va. Code § 19.2-264.3:1 on August 29, 2006, Mr. Muhammad limited himself to one of the three types of mitigation evidence listed in the statute: "the history, character or mental condition of the Accused."  S.F.H.A. 41-42.  He specifically informed the trial court and Commonwealth that the expert "testimony will not address whether the Defendant acted under extreme mental or emotional disturbance at the time of the offense, or whether the capacity of the Defendant to

4

appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law, was significantly impaired." *Id.*

After filing the 3:1 notice, the attorneys continued their investigation in support of their strategy. The attorneys arranged funding for Dr. Cunningham with the Maryland Office of the Public Defender. F.H.A. 1325-26. The attorneys provided Dr. Cunningham with the documentary evidence in the case. F.H.A. 1329-30.

Dr. Cunningham interviewed Mr. Muhammad on September 6 and 7, 2003. The purpose of this interview was not to evaluate or diagnose Mr. Muhammad. At the time, the attorneys knew that Dr. Cunningham would not be allowed to rely on any factual statement made by Mr. Muhammad, because Virginia law, unlike federal law, does not allow experts to rely on out-of-court hearsay statements. F.H.A. 1636.

The mitigation investigation continued. On September 4, 2003, Milam interviewed Mr. Muhammad's sister Bessie Holiday. Bessie described the torment she, Mr. Muhammad, and the other children went through, explaining, "We're lucky to be alive, that's how we grew up." Guy Holiday took custody of the children when their mother got too sick to care for them, and then turned them over to their aunt Annie. Their aunts Annie and Penny each abused the Williams children, including Mr. Muhammad, all of their lives. The children were beaten unmercifully. Annie would often direct Guy to beat one of the children, and if he did not beat them severely enough, Annie would eject Guy from the house for the night. Other members of the family would beat Mr. Muhammad and the other children, and then call for Annie to take over the violence against the children. There was no right or wrong actions; everything the children did drew violence from the adults. F.H.A. 1633.

According to Bessie, Annie got joy from beating the children in front of the neighbors, but the neighbors wanted to "mind their own business" rather than report the abuse. The neighbors sometimes called the authorities, but children at that time did not enjoy the same protections they do today. F.H.A. 1633.

Bessie explained that Annie did her best to keep the children from forming emotional bonds with each other. Annie and others did not allow Bessie to recognize each other as brother and sister. The children were never given presents or toys of any kind for Christmas or birthdays. If one of the neighbors gave them a toy, all five of them would have to share it. F.H.A. 1633.

Bessie told Milam that Mr. Muhammad's grandmother Sarah Holiday was worse, if possible. Bessie described her as a "monster" who is "burning in hell right now." Sarah was a miserable person who seemed to enjoy other people's pain. Bessie remembered one time when Sarah asked a child's name, then began to beat him. When the child asked what he had done, Sarah told him, "I'm not beating you for what you did, I'm beating you for what you might do." F.H.A. 1633-34.

Bessie also described the unbelievable neglect of the children, even though money was coming into the household. Annie would buy the cheapest clothes and shoes, which wore out a few months into the school year; the children had to wear them, holes and all, through the school year and the summer. Penny, unlike Annie, did provide some food for the children; otherwise, they would have starved. Bessie explained, "We would have been better off in foster homes, but they wanted us for the money. They fed us nothing but grits, greens, and beans from the garden, and if you weren't home when they ate, too bad." F.H.A. 1634.

6

Bessie explained that the violence and privation had severely affected each of the children. She said that, "Everyone in my family has something wrong mentally." Bessie said that, as a result of their horrible childhood, there is violence in each of the children: "If you talk to us long enough, you'll see it." F.H.A. 1634.

To follow up on the investigation of Mr. Guastaferro and Mr. Milam, the attorneys coordinated a trip by Mr. Shapiro and Dr. Cunningham to Louisiana to gather information for Dr. Cunningham's mitigation presentation. F.H.A. 1331, 1332. The attorneys also made arrangements for Dr. Cunningham to interview by phone those he could not meet in person. F.H.A. 1333. In mid-September 2003, Dr. Cunningham interviewed Edward and Jackie Williams, Felton Holiday, Aurolyn Williams, James Ryals, Bessie Holiday, and Keith McFarland. These witnesses and others provided Dr. Cunningham with heart-wrenching stories of the abuse and neglect Mr. Muhammad suffered as a child—beatings with hoses and electrical cords, denial of food, clothing, and basic necessities, and suffering on a scale difficult to imagine. F.H.A. 1495-512, 1636.

<em>Defense disclosures to the Commonwealth</em>

After receiving notice, the Commonwealth filed a motion for appointment of a mental health expert pursuant to Va. Code § 19.2-263.3:1(F) and for an evaluation concerning the existence or absence of mitigating circumstances related to Muhammad's history, character and mental condition as well as a copy of the report prepared by Muhammad's experts. 5 J.A. 1868-70. Noting the limitations in Mr. Muhammad's 3:1 Notice, the Court granted the motion, but ordered that Mr. Muhammad did not have to cooperate in an evaluation of any mental or emotional disturbance at the time of the offense, ability to appreciate the criminality of his

conduct, or capacity to conform his conduct to the requirements of the law.  5 J.A. 1960-61, 1966-67; 8 J.A. 3370-402.

On September 12, 2003, Mr. Muhammad turned over to the Commonwealth medical, school, brain imaging, military, and psychological testing records.  F.H.A. 1334-35.  On September 23, 2003, Mr. Muhammad disclosed to the Commonwealth the report of Dr. Stejskal and Dr. Ryan, commonly called the "3:1 Report."  F.H.A. 1346-56.  The 3:1 Report briefly described the abuse and neglect that Mr. Muhammad had suffered as a child and that Mr. Shapiro, Dr. Cunningham, Mr. Milam, and others had discovered in Baton Rouge.  F.H.A. 1344-45.

On September 24, 2003, Mr. Muhammad provided the Commonwealth with notice that Dr. Cunningham would testify at the penalty phase, even though Virginia law does not require such notice.  F.H.A. 1357-59.  The letter explained:

> Mark Cunningham, Ph.D. may testify for the defense.  Dr. Cunningham's Curriculum Vitae is attached.  Dr. Cunningham will review for the jury the various mitigating circumstances in the accused's background and history, and give his opinion as to how they had adverse developmental impacts and resulted in sustained vulnerability in his adulthood.
>
> Those circumstances include the inadequacies in his upbringing, the losses he suffered as a child, his dysfunctional, neglectful and emotionally and physically abusive rearing, his
>
> chaotic foster household, his emotional rejection and abuse, the traumatic loss of his mother and grandmother, his abandonment by his father, his abnormalities in neurological functioning, as well as other factors in his background.  Dr. Cunningham will also testify concerning the accused's loss of adult psycho-social supports, his attempt to create constructive and functional psycho-social supports and the erosion and loss of those supports.  We will be offering Dr. Cunningham's opinions and conclusions in mitigation of punishment.

> Further, Dr. Cunningham will testify concerning violence risk assessment for Mr. Muhammad based upon the information he has gathered about him, and based upon Dr. Cunningham's extensive experience and research. He will testify that because prison is a fundamentally different context from the community, prison violence does not predictably follow from pre-confinement violence or the capital offense of conviction. He will testify that the only reliable methods to make predictions about the risk of future violent behavior in prison are by using past patterns of violence in incarceration and/or other highly structured contexts, and application of group statistical data. The substantial majority of those convicted of murder, life sentenced capital offenders, and commuted capital offenders do not commit acts of serious violence in prison. Thus it is unlikely that Mr. Muhammad will. For purposes of this assessment only, Dr. Cunningham has assumed the truth of the charges in the indictments in this case.

F.H.A. 1357-58.

*Preparation for the penalty phase*

Because Mr. Muhammad apparently did not want to acknowledge his horrific childhood, he told his attorneys that he would deny any abuse to Dr. Dietz. F.H.A. 1388. The attorneys turned for help to Dr. Cunningham, explaining that they knew Dr. Cunningham "can testify that children suffering from abuse can forget, or dissociate, or not wish to acknowledge it." *Id.*

In late September and early October, Dr. Cunningham sent Mr. Muhammad's attorneys draft power point slides of his proposed mitigation presentation. F.H.A. 1389. Their plan, developed in consultation with Dr. Cunningham, was to lay the foundation for Dr. Cunningham's testimony through lay witnesses, then have Dr. Cunningham summarize the testimony and provide models of moral culpability that the jury could understand. Dr. Cunningham's presentation would include a visual model depicting each of the destructive influences in Mr. Muhammad's life as a weight on a crumbling bridge, and each of the constructive influences as a supporting structure. Dr. Cunningham would also testify to his risk assessment of the low statistical probability that Mr. Muhammad would commit serious violent crime in prison. In this

way, Mr. Muhammad's defense team would not attempt to excuse Mr. Muhammad's crimes, but rather provide each juror with a basis to exercise his or her individual moral judgment to vote for life imprisonment without the possibility of release rather than death.  F.H.A. 1516-62.

One topic Mr. Greenspun, Mr. Shapiro, and Dr. Cunningham examined was Mr. Muhammad's denial of his horrific childhood. Mr. Muhammad's attorneys knew that he might tell Dr. Dietz that his childhood was peaceful and idyllic, or indeed that he might take the stand and testify to such falsehoods.  The attorneys planned to address this problem through Dr. Cunningham's testimony, and Dr. Cunningham included Mr. Muhammad's denial as a metaphorical support which allowed him to handle the weight of the destructive influences in his life.  For example, this diagram is one of the slides Dr. Cunningham developed in conjunction with the attorneys, with the "denial" support highlighted:



F.H.A. 1641.

*Exclusion of all penalty-phase expert testimony*

Mr. Muhammad's attorneys anticipated issues with Dr. Dietz' evaluation, and tried to address them in advance.  On September 29, 2003, Mr. Greenspun wrote to the Commonwealth asking to know when the evaluation would take place, asking to be present for Dr. Dietz' interview given the court-ordered limits on the evaluation, and objecting to possible videotaping of the interview.  F.H.A. 1643.  The Commonwealth honored none of these requests, and on October 8, 2003, Dr. Dietz had Mr. Muhammad brought to an interview room where his video camera was being set up without notice to or the presence of counsel.  9 J.A. 4012, 4016-17.  Mr. Muhammad was not disruptive, but left the room when he saw Dr. Dietz, a detective, and the video camera.  9 J.A. 4012, 4017.  When Mr. Greenspun and Mr. Shapiro learned of this tactic, they knew that it was a deliberate attempt to provoke Mr. Muhammad.  F.H.A. 1643.

The trial court held a hearing on October 8, 2003.  9 J.A. 4010.  Dr. Dietz explained that he had attempted to interview Mr. Muhammad that morning, but that Mr. Muhammad had refused to participate in the interview.  9 J.A. 4012.  Dr. Dietz testified that he was not aware that Mr. Muhammad had given a limited notice of intent to use expert testimony at sentencing.  9 J.A. 4024.  In fact, Dr. Dietz had planned to interview Mr. Muhammad about possible mental disease, defect, or impairment despite that fact that Mr. Muhammad's expert notice excluded this area of inquiry.  9 J.A. 4024.   When Dr. Dietz understood the limited scope of his inquiry, he said that the limitation would "shorten the time I will need considerably."  9 J.A. 4028.

The trial court ordered Mr. Muhammad to submit to the interview, allowed counsel to be present, and clarified that the interview was limited to issues concerning only the existence or absence of mitigating circumstances related to Muhammad's history, character, or mental condition.  9 J.A. 4027; 5 J.A. 2008.  The judge explained that, even at that stage, he was

11

inclined to bar any psychiatric expert evidence if he found a failure to cooperate, without weighing prejudice or alternative sanctions.  9 J.A. 4010.

On October 9, 2003 the trial court held another hearing.  9 J.A. 4063.  Prior to the hearing, Dr. Dietz met with defense counsel and explained that he could perform an evaluation and testify from the records without interviewing Mr. Muhammad directly.  F.H.A. 1644.  Dr. Dietz testified that Mr. Muhammad refused to meet with him that morning, but that Mr. Muhammad's counsel were willing to allow Dr. Dietz to interview neurologist Dr. Jonathan Pincus, psychologist Dr. Mark Cunningham, and eight family members of Mr. Muhammad.  9 J.A. 4067-69.  Dr. Dietz testified that he understood the evaluation was a "fairly limited" one, and that in the past, he has testified about a defendant's background and mental state without interviewing the defendant.  9 J.A. 4068-69.

The Commonwealth moved "to prohibit any type of mental health testimony at the time of the sentencing if it's necessary."  9 J.A. 4072.  Mr. Muhammad, in response, stressed the constitutional importance of mitigation evidence and expert testimony interpreting the mitigation evidence.  9 J.A. 4073-74.  He argued that the exclusion of experts would be unconstitutional, citing *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982). The defense explained the ruling of the Supreme Court of Virginia in *Lovitt v. Warden*, 585 S.E.2d 801, 825 (Va. 2003), about the importance of a psychologist to relate evidence of social history to the defendant's development.  9 J.A. 4074.  Mr. Muhammad also explained the limited, non-psychiatric nature of the expert testimony, and asked the trial court to impose a sanction less drastic than complete exclusion of all expert testimony.  9 J.A. 4075-76.  In the course of the hearing, Mr. Shapiro explained that rather than rely on statements of the defendant,

Dr. Cunningham would base his expert opinions on the evidence introduced in court as required by Virginia law.  9 J.A. 4076-78.

The trial court ensured that Mr. Muhammad understood that he was ordered to cooperate with Dr. Dietz, and that Mr. Muhammad understood that the court might exclude his expert witnesses as a sanction for his non-cooperation.  9 J.A. 4083-44.  The trial court then stated: "The Court is going to rule under 19.2-264.3:1 that after hearing evidence presented by the parties out of the presence of the jury the Defendant has refused to cooperate with an evaluation requested by the Commonwealth.  The Court is going to bar the Defendant from presenting any expert testimony in this – according to these issues.  And that again is pursuant to 19.2-264.3:1F2."  9 J.A. 4084-85.  The trial court granted Mr. Muhammad the right to proffer the testimony of the witnesses in writing.  9 J.A. 4085.

*Reconsideration of the expert exclusion*

Mr. Muhammad immediately moved the trial court to reconsider its decision.  F.H.A. 2-9.  In his Motion to Reconsider and Request for Clarification, Mr. Muhammad explained the mitigation strategy the attorneys planned to pursue if expert testimony were admitted: "In the present case, the defense is prepared to offer expert testimony about the history and character of the defendant through family members and friends, and to then have our experts opine as to the effects of that history. . . . We are willing to do this without any reference to interviews with the defendant.  Nor will the testimony be based upon any information gained through interviews with the defendant."  F.H.A. 4.  The motion asserted Mr. Muhammad's constitutional right to present such evidence, citing *Wiggins v. Smith*, 539 U.S. 510 (2003), *Penry v. Lynaugh*, 492 U.S. 302 (1989), *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and *Lockett v. Ohio*, 438 U.S. 586 (1978).  F.H.A. 2.  The motion also explained that the proposed expert testimony created no

13

imbalance with the Commonwealth given Virginia law prohibiting experts from relying on hearsay statements in criminal cases, and that lesser sanctions were more appropriate than total exclusion of all experts.  F.H.A. 4-7.

Trial counsel continued to prepare for Dr. Cunningham's testimony in the hope that the trial court would reconsider its blanket ban on expert testimony.   On October 10, 2003, Mr. Shapiro provided Dr. Cunningham and the Commonwealth with additional records.   F.H.A. 1390, 1391-92.

As instructed by the trial court, the defense obtained a statement from Dr. Cunningham. In his statement, Dr. Cunningham explained his proposed testimony regarding the impact of risk and protective factors on a defendant's development, and explained in detail why he would not rely on any statement of Mr. Muhammad in his testimony.  In part, Dr. Cunningham explained:

10.     The relevance of the above developmental research to a particular defendant is not dependent on a direct evaluation or interview. To explain, direct evaluation in mental health practice, whether clinical or forensic, provides two functions: 1. obtaining a history; 2. assessing the presence of current symptoms of a mental disorder. There is little to no data obtained from an interview or testing that would demonstrate whether an adverse event in a patient's (or defendant's) developmental history "caused" a currently observed condition or outcome in adulthood. Rather, certain historical/developmental factors are identified as risk factors that contributed to the adult outcome with varying degrees of weight - based on research on groups of similarly situated individuals. The clinical practice of medicine and psychology rests on the application of such group derived "risk" data to the specific patient. Further, it is not anticipated that a patient or defendant has comprehensive insight into how he has been affected by these developmental risk factors, nor is the impact dependent on his recognition of it. The application of research findings to the developmental experiences of a particular defendant is based on the presence or absence of these events in the defendant's history, not on whether this history was self-described or accompanied by insight. Thus, apart from the history obtained, interview observations and/or testing data do not illuminate the nexus between adverse developmental experience and criminal and/or violent outcome. Consistent with this conclusion, findings of the United States Department of Justice regarding the nexus between adverse developmental factors and criminal/violent outcome by late adolescence and early adulthood, and the associated prescription of preventative measures, are without recourse to interviewing or testing specific at-risk youth to determine whether the nexus applies to them.

11.     My interview of John Muhammad was directed toward obtaining a history that would inform an analysis of developmental trajectory as described above, and not assessing the presence of current or time-of-offense symptoms of a mental disorder. Accordingly, I did not engage in any psychological testing and have not posited any mental disorder currently or at the time of the charged offense(s). Accordingly, it is no challenge to set aside the history obtained from Mr. Muhammad, and instead rely on the history that I obtained through interviews of third parties, review of records, and testimony of witnesses at trial. In a federal capital case, U.S. v Daymon Smith (2000), No. 1:909-CR-164(3) in U.S. District Court, Eastern District of Texas, Beaumont Division, I had interviewed the defendant and the defense subsequently objected to an interview by

5

the Government's expert. I was asked if I could set aside any information/perspectives regarding that interview of the defendant, and solely base my testimony on my review of records, interviews of third parties, and any relevant testimony at trial. I responded that I could set the interview aside and I was allowed to testify at capital sentencing regarding mitigation (the defense elected not to have me testify regarding violence risk assessment).

12.     The defendant is neither the sole nor most reliable source of historical information regarding important formative developmental events in his life. These events can also be made known to a capital jury through the testimony of family and community members.

13.     At sentencing in a capital case, a tragically violent adult outcome is an adjudicated certainty. A psychologist who is familiar with the research demonstrating the relationship between various damaging developmental factors and adverse adult outcomes including criminality and violence can ethically and reliably inform a capital jury of this nexus. The specific factors discussed in this testimony can be particularized based on interviews of third parties, interview summaries prepared by investigators, review of records, testimony of lay witnesses at trial, or hypotheticals, without reliance or reference to historical data regarding developmental experiences obtained from the defendant.

F.H.A. 61-62.

The Commonwealth also submitted an affidavit from Dr. Dietz.  F.H.A. 94-100.  Dr. Dietz, who is both a psychologist and a psychiatrist, explained that it was possible and proper to testify about a defendant without interviewing him, as well as possible and proper to exclude consideration of an interview while testifying.  He stated in relevant part:

> 12.  Where the defendant and an important proximal witness are unavailable for personal interview, as here, the expert must rely exclusively on other sources of data such as recorded statements in police or mental health interviews, testimony, or elsewhere; reports detailing their statements; or other evidence of the defendant's life history and behavior, including motivations, thoughts, and feelings.

> 13.  Reliance on sources of information other than the defendant's statements is proper.  In forensic psychiatry, there is an ethical obligation to attempt a personal examination of the party whose behavior is at issue and to disclose to the fact finder that such an examination was not conducted and that this limits the findings that can be reached.  If the reason an examination was not conducted is not explained to the fact finder, the fact finder may be left with the false impression that the expert was insufficiently diligent.

> 14.  If called to testify in this matter, I respectfully request that I be permitted to explain to the jury why I did not examine Mr. Muhammad or interview Mr. Malvo.

> 15.  When an expert, such as the defense experts in this case, has had access to data that has been ruled inadmissible, such as a personal examination of the defendant, it is possible to exclude those data from consideration in giving testimony. I have been in this situation myself on more than one occasion.  Such situations carry the risk of inadvertent reliance on the excluded data in both obvious ways (e.g., the "blurting" of excluded evidence) and subtle ways (e.g., an unrecognized effect on the expressed certainty of one's opinions), for which safeguards or remedies may be needed.

F.H.A. 98-99.  In his affidavit, Dr. Dietz asked the court for precisely the information that the defense had previously offered to him:

> 17.  If the court, upon hearing the defendant's motion to reconsider, permits the testimony of defense expert witnesses, I respectfully request that my colleague, Helen Mayberg, M.D., and I be permitted the following access to data:  (a) a neurological examination of the defendant by Dr. Mayberg if Dr. Pincus is permitted to rely on the findings of his examination of the defendant, (b) copies of any notes or reports of Dr. Pincus and Dr. Cunningham and any defense investigative reports or records provided to them that are not already in the possession of the government, (c) copies of any raw test data such as brain images or EEG tracings relied upon by Dr. Pincus, and (d) either interviews with the aforementioned experts and family members (see paragraph 17) to be conducted in Virginia Beach between November 19 and December 23, 2003, or permission to attend their testimony between November 19 and December 23, 2003, or both.

Once Mr. Greenspun and Mr. Shapiro were representing Mr. Muhammad again, they turned back to the issue of Dr. Cunningham's testimony.[3]  On October 25, 2003, Dr. Cunningham delivered final versions of his PowerPoint demonstrative exhibits to Mr. Muhammad's attorneys in anticipation that he might be permitted to testify.  F.H.A. 1516.  On October 27, 2003, the defense renewed its motion to reconsider the exclusion of expert testimony.  14 J.A. 6429.  Arguing the motion, Mr. Shapiro explained that the trial court had before it the affidavits of Dr. Nelson, Dr. Cunningham, and Dr. Dietz.  14 J.A. 6430.

---

[3] On October 20, 2003, while Mr. Muhammad was acting as his own counsel, he told the trial court that he wished to go forward with the motion to reconsider.  12 J.A. 5450.  The next day, still acting *pro se*, he told the trial court he wanted to withdraw the motion.  12 J.A. 5457-58.

In the motion, the defense explained that Dr. Cunningham and Dr. Dietz would be in exactly the same position with respect to Mr. Muhammad's background, relying on records and live witness testimony. 14 J.A. 6430-31. The defense also explained that Dr. Cunningham would testify to a statistical risk assessment of Mr. Muhammad's future dangerousness in prison separately from his opinions about the effect of his traumatic childhood. Relying on *Lovitt*, 585 S.E.2d at 825, Mr. Muhammad explained that, "Only an expert can take the testimony of the family members and have it make sense, show the impact of all that is; and that's what he would propose to do." 14 J.A. 6440. Again, the defense cited the constitutional entitlement to place Dr. Cunningham's testimony before the jury under *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and *Lockett v. Ohio*, 438 U.S. 586 (1978).

The trial court denied Mr. Muhammad's motion to reconsider, making three rulings, but not directly addressing the *Lockett-Eddings* claim. First, the trial court said that the defense had not carried its burden of proof to demonstrate that the Commonwealth would not be unfairly prejudiced. 14 J.A. 6443. Second, the trial court refused to hold an evidentiary hearing. 14 J.A. 6447. Third, the trial court questioned the ability of Dr. Dietz to participate in a sentencing hearing. 14 J.A. 6556-47.

On November 12, 2003, prior to closing arguments in the guilt phase, the defense again raised the issue of Dr. Cunningham's testimony. 18 J.A. 8601. On November 21, 2003, the defense proffered another affidavit from Dr. Cunningham. 21 J.A. 10086; *see also* 21 J.A. 9960-61. In the second affidavit, Dr. Cunningham listed specific risk and protective factors he would have testified about in the penalty phase. 23 J.A. 10776-77.

*The actual penalty phase*

18

On November 17, 2003, the sentencing phase began with the Commonwealth's presentation of evidence in aggravation.  These witnesses testified to additional criminal conduct that included the death of Keenya Cook, a shooting at a Jewish Synagogue, and an attempt to escape at the Manassas Adult Detention Center.  The testimony included evidence of hate-filled attitudes towards certain aspects of the population such as anti-Semitic statements, evidence regarding the use of and access to other firearms and victim impact statements.

Isa and Tamara Nichols talked about the night Keenya Cook died.  19 J.A. 9050-92; 20 J.A. 9131-39.  Larry Meyers, Robert Meyers, and Jane Pryzgocki, family and friends of Dean Meyers, gave victim impact statements.  21 J.A. 9593-608, 9611-15, 9616-22.

Law enforcement officers testified about forensic evidence, medical examinations and firearms taken from the Dancy home in Washington.  20 J.A. 9139-47, 9147-55, 9155-65, 9165-77, 9177-87.  Earl Dancy Jr. testified about turning over guns to the FBI, purchasing the Remington 700 rifle for Mr. Muhammad, evidence of Mr. Muhammad's hatred for Jewish people and the malice he had for Mildred.  20 J.A. 2225-61.  Three other witnesses spoke about a bipod and scope linked to Mr. Muhammad.  20 J.A. 9206-17, 9219-22, 9425-32.

Rabbi Mark Glickman described the holes in the walls of the Temple that appeared to be damaged by bullets.  20 J.A. 9189-93.  Robert Wyatt and Evan Thompson testified about the scene at the Temple Beth El and possible links to a Smith and Wesson .44 magnum revolver.  20 J.A. 9193-96, 9199-205.

Employees of the Prince William Adult Detention Center recounted the incidents regarding Mr. Muhammad and his dispute with offered clothing, flooding and a sharpened spoon.  20 J.A. 9311-22, 9340-46, 9376-83, 9394-98.  John Hair, a Special Agent with the FBI, testified about the maps and images found in the car.  20 J.A. 9363-73.   Mildred Muhammad

testified about Mr. Muhammad's military background and skills, his employment, what kind of father he was to their children and what kind of relationship they had together.  20 J.A. 9442-75.

Beginning on November 19, 2003, fifteen witnesses for the defense testified about Mr. Muhammad's background: living in poverty, having a mother who died when he was three from cancer and being raised by the oldest sibling in the house who was twelve at the time.  Witnesses spoke about Muhammad's military training in the National Guard and the United States Army.  They testified about his skills as a trade laborer and helping neighbor.  Witnesses spoke about him as a loving father to his children and about his time spent in a homeless shelter.

Ruby Beeler-Francis testified about the character of Muhammad and the great quality of work he did on her cars.  21 J.A. 9623-35.  Jerome Brazwell recounted the friendship he had built with Mr. Muhammad as a co-worker and the good relationships he had with clients and family members.  21 J.A. 9643-58.  Felix Strozier spoke about Mr. Muhammad's strengths as a business partner and his dedication to their clients.  21 J.A. 9663-69.  Mary Marez testified about the loving nature of Mr. Muhammad's character, his skills as a mechanic and his strengths as a father, friend and companion.  21 J.A. 9677-93.

Gregory Grant testified about Mr. Muhammad's polite nature as a day laborer.  21 J.A. 9726-33.  Donald Haaland spoke about Mr. Muhammad's work ethic and how not having his kids around made him noticeably sad.  21 J.A. 9736-44.  Reverend Archer testified about his friendship with Mr. Muhammad, the time he spent at the Lighthouse Mission and the giving relationship he had with his children.  21 J.A. 9793-800.  Leo Dudley testified about Mr. Muhammad being a great neighbor for all the kids around and his work ethic.  21 J.A. 9807-13.

Jerry O'Neil testified about the times he cut Mr. Muhammad's hair in the military and their discussions about what they could do to improve the black community.  21 J.A. 9814-21.

20

Jerry Page recounted his observation of Mr. Muhammad and his kids at Lighthouse Mission and the love and respect they shared for each other.  21 J.A. 9824-33.  Nathan Perry testified about his close friendship with Mr. Muhammad, and the activities they used to share like card games and sports.  21 J.A. 9840-50.  Robert Holmes spoke about Mr. Muhammad volunteering to help with the Boys and Girls Club and helping with the boxing program for children off the streets. 21 J.A. 9863-70.  Amanda Lambert testified about the incident at Prince William Detention Center and the good behavior Mr. Muhammad displayed while housed there.  21 J.A. 9903-41.

Edward Williams, the brother of Mr. Muhammad, testified about their mother dying when Edward was two and the time they spent in the military together.  Edward also recounted the relationship that Mr. Muhammad had with his nephew, Edward Jr.  21 J.A. 9875-82. Aurolyn Williams testified about life in New Orleans, their father living in another home with his own family and what it was like when their mother died of breast cancer.  Aurolyn recounted their youth as having friends in and out of the house coming to cook and clean and what their living conditions were like.  She also spoke about what a good father he was to his children.  21 J.A. 9887-96.

The jury returned a verdict of death on November 24, 2003.

*The penalty phase trial counsel wanted*

On November 19, 2003, the defense team had begun their mitigation presentation by calling witnesses to the stand to testify about Muhammad's childhood; living in poverty, having a mother who died when he was three from cancer and being raised by his twelve-year-old sibling.  Witnesses spoke about Muhammad as a business man, a neighbor, a father and a friend. The testimony that these witnesses provided only scratched the surface of the real story about Muhammad's life and how it affected him as a person.  Because of the trial court's ruling, the

21

jury did not hear of the horrific abuse of Muhammad as a child, and even more importantly, what effect all of this mitigation evidence has on his moral culpability.  In-depth testimony by family members and the testimony of Dr. Cunningham that would have shed practical meaning to their stories is an important part of the mitigation phase that trial counsel wanted to present, but felt they could not.

Aurolyn Williams, the youngest female of the Williams siblings, describes in her proffer what it was like growing up after their mother died from breast cancer.  When Aurolyn was five, the family moved to Baton Rouge to live with their grandparents, Guy and Sarah Holiday.  There were 20 people of all ages living in a three bedroom home.  They weren't provided with new clothes, shoes or toys and weren't permitted to attend social activities.  The Williams children were beaten with electrical cords, switches, hoses, and the front and backs of hands.  The Williams children were required to eat separately from everyone else in the house and ate black-eyed peas every day.  They weren't allowed in the house during the day and had to wait until night to enter and they never received medical or dental care.  If they brought home a medical bill, they were beaten.  Aurolyn explained that she and her siblings didn't know when their birthdays were until they were in elementary school and they never received gifts then or on any other holiday.  No one attended their high school graduation.  F.H.A. 130-32, 1470-71.

Bessie Williams, the oldest of the six siblings, remembers their mother always being in pain with no money for medication for herself or her children.  Bessie lived with her grandmother, Sarah, but at age eleven, would leave for weeks at a time to go take care of her dying mother.  Bessie's father, Ernest, would beat them and their mother and eventually they all moved in with Sarah and Guy Holiday.  Bessie explained that Guy used to beat them with a leather paddle and a wooden handle.  The paddle would leave large blue bruises and she felt like

they were being raised like animals.  Bessie eventually moved into an apartment in the same neighborhood and could still hear her siblings screaming.  F.H.A. 137-38.

Edward Williams, the youngest of the six siblings, explained that after their mother died, no one spoke of her ever again.  Her best friend, Francis Smith, wanted to take the children in herself because she knew the Holidays would not take care of the Williams children but the Holidays fought for custody and won.  Edward was two when their mother passed away and didn't see a picture of her again until he was in his 30's.  He describes living with the Holidays like someone who would "steal your soul and there's nothing you can do about it."  Edward recounted stories about the physical and verbal abuse they used to endure.  Guy Holiday would jump on John without reason or lock him in the bathroom.  Their aunts would take their shoes off and beat them and drag them by their hair.  Mr. Muhammad was forced to put his hand on the sparkplug of a lawnmower while Guy pulled the cord.  Edward remembers that they would all get beaten for things every kid did when they were little like wetting the bed or making a mess. He describes being beaten in every single part of the house, inside and out.  They were beaten down physically and verbally and Edward said there wasn't a day that went by that he felt good about himself until he met his wife.  F.H.A. 133-36, 1473-76.

The rest of the children in the house were treated differently.  They were not beaten, they celebrated holidays, and their parents were around to protect them.  Everyone in the house would eat first and the Williams children would eat last.  There were two teachers in the house and they would teach the other kids but wouldn't help the William kids learn anything.  All through high school Edward couldn't read.  Edward also remembers being beaten continuously by Felton Holiday, their uncle.  Felton was a prison guard at a reform school and had a reputation for being brutal to young men there as well.  F.H.A. 135, 1475.  On June 25, 1962, Felton Holiday was

found guilty by the State of Louisiana of battery with a dangerous weapon for beating a youth to death at a correctional facility.  F.H.A. 140-43.

The stories told by these family members would have laid a foundation for Dr. Cunningham's testimony about regarding risk and protective developmental factors for violence identified by the U.S. Department of Justice.  Dr. Cunningham would have provided concrete information to show that while some capital defendants may be criminally responsible for an act, they vary in their moral culpability and ultimately, in their blameworthiness.  F.H.A. 30-31.

Dr. Cunningham's testimony would have shown that while making a choice, if damaging or impairing factors are high, moral culpability is low.  These damaging and impairing factors are shown in what the Department of Justice has found to be childhood risk factors for crime. F.H.A. 1519.  These family factors include parenting, maltreatment, family violence, divorce, parental psychopathy, familial antisocial behaviors, teenage parenthood, familial structure and large family size.  Dr. Cunningham found Mr. Muhammad affected by all of these risk factors except divorce.  However, in place of divorce, Mr. Muhammad grew up in a bigamous nuclear family structure in poverty and isolation.  F.H.A. 1519.

Risk factors can be countered by protective factors that inhibit violence and delinquency in the community.  These protective factors include female gender, intelligence, positive social orientation, resilient temperament, and social bonding to family, teachers, coaches, youth leaders and friends.  Dr. Cunningham found Mr. Muhammad to only have one protective factor; positive social orientation.  F.H.A. 1520.

The risk factors that Dr. Cunningham found to be present in Mr. Muhammad's life can be broken down more specifically into examples of brain impairment, mother's teenage pregnancies, father's physical abuse of mother, terminal illness of mother and disrupted primary

24

attachment, temporary care providers in early childhood, emotional neglect by father, death of mother, abandonment by father, multi-generational family dysfunction, chaotic foster household, death of grandmother, emotional neglect, rejection and abuse, physical abuse of self and siblings, inadequate supervision and guidance, isolation from peers, racial prejudice and no intervention by neighbors or schools.  F.H.A. 1546.  This fractured development eventually leads to a broken foundation that is necessary in order to make good choices.   The fractured development ultimately lowers one's moral culpability.

Among other things, Dr. Cunningham identified as a risk factor the neurological abnormalities shown by Mr. Muhammad's MRI brain scan.  F.H.A. 1526-27.  The trial court's sweeping exclusion of expert testimony prevented the jury from hearing about MRI neurological deficits from Dr. Cunningham, Dr. Pincus, Dr. Stejskal, or any other source.

In addition to testimony regarding Mr. Muhammad's risk and protective factors, Dr. Cunningham would have testified about statistical risk assessment and its implications for future dangerousness.  Based on research studies, Dr. Cunningham would have testified that preventive measure such as consequences, confinement, staff, structure, and security would outweigh the risk factors that the defendant would be violent in prison.  F.H.A 1557.   Based on these statistical data, Dr. Cunningham would have testified that Mr. Muhammad would not be a future risk and would adjust well to the Virginia Department of Corrections due to his older age, his non-violent behavior in pre-trial confinement, his history of school graduation and community employment and his continuing relationships with community members.  F.H.A. 1550.

*Post-trial litigation*

On February 9, 2004, Mr. Muhammad filed a motion to set aside the verdict.  5 J.A. 2099, 2103.  Citing *Taylor v. Illinois*, 484 U.S. 415 (1988), he repeated his argument that the trial

court erred in barring all expert testimony in the penalty phase as a sanction for failing to cooperate with Dr. Dietz.  5 J.A. 2130.   Mr. Muhammad also noted the denial of his constitutional right to present mitigation evidence, again citing *Wiggins*, *Penry I*, *Eddings*, and *Lockett*.  In response to the anticipated Commonwealth claim that Mr. Muhammad had no right to present expert mitigation evidence because he refused to submit to the Commonwealth's 3:1 evaluation, the defense explained that the Commonwealth was not entitled to a 3:1 evaluation at all under the plain language of the statute.  5 J.A. 2131-32.

In the motion, Mr. Muhammad noted the devastating effect the trial court's ruling had upon his penalty phase presentation: "Barring all expert testimony deprived the defendant of the right to present his only mitigation defense – that of extreme deprivation and physical abuse as a child."  5 J.A. 2129.  He explained, "The harm suffered by the defendant simply cannot be overstated.   Dr. Cunningham was prevented from giving his view of the effects of the defendant's horrific childhood."  5 J.A. 2132.  He laid out his prejudice in detail, explaining that, "As a result of the court's ruling, the defendant was unable to present the testimony of three of his siblings which would have formed the basis for Dr. Cunningham's opinions," as well as documentary support.  5 J.A. 2134-35.  Citing *Lovitt v. Warden*, 585 S.E.2d 801 (Va. 2003), Mr. Muhammad explained, "It is no answer to say that this testimony could have been presented even in the absence of Dr. Cunningham's testimony.  The fact is, without Dr. Cunningham's ability to take this testimony and interpret it for the jury, it would have significantly less impact."  5 J.A. 2136.

In support of his motion, Mr. Muhammad submitted a number of important documents. [4] As Exhibits F through I, Mr. Muhammad provided the court with proffers describing the testimony that Aurolyn Williams, Edward Williams, Bessie Williams, and Keith McFarland would have provided if Dr. Cunningham had been allowed to relate Mr. Muhammad's horrific upbringing to his moral culpability.  F.H.A. 130-39.  He also provided documents about the Holiday family and Felton Holiday's brutality which he would have submitted to the jury if Dr. Cunningham could have explained their relevance.  F.H.A. 140-207.

In oral argument on the post-trial motion, Mr. Muhammad raised these same points. With respect to the statutory interpretation of Va. Code § 19.2-264.3:1, the defense agreed that it has not raised that specific rebuttal to the Commonwealth's argument, but maintained that it was fairly encompassed within their papers.  22 J.A. 10232-34.  Mr. Shapiro explained the immense impact that trial court's bar had on the penalty phase:

---

[4] The Motion for Judgment of Acquittal Notwithstanding Verdict, Or, In the Alternative, For a New Trial and its supporting Memorandum appear in the Joint Appendix at 5 J.A. 2099 and 2103, respectively.  The twelve exhibits submitted in support of the motion, labeled Exhibits A through M, appear in the record but not the Joint Appendix.  They may be found at F.H.A. 71-221.

It just seems too severe a remedy given the ramifications for our entire mitigation case. I can't tell the Court in strong enough language the incredible amount of effort that went into putting together a case which then basically evaporated and never got to see the light of day because of that.

And the family members who were here at the Court's subpoena and the Commonwealth's expense to testify, it was testimony that automatically -- it just became beside the point because there was no one to put it into context, no one to interpret it for the jury.

It's the same thing that happened in the case that we cited during trial -- I'm not sure they are in our current papers -- where there was an ineffectiveness claim because the counsel in a death penalty case didn't put on the Defendant's background. The Court said, "Well, your claim fails because you haven't proffered that there would have been a psychologist or psychiatrist to interpret that for the jury."

Well, we knew that, and we knew that what

these folks were going to say would really just be a bunch of loose ends which wouldn't make a lot of sense. It needed to be gathered together by Dr. Cunningham.

And so our mitigation case just went by the boards. It had that much of an effect on us, Judge. We just think the remedy that you imposed was too severe.

22 J.A. 10239-40.

28

The trial court again rejected Mr. Muhammad's objection—in its fourth iteration by this point.  The trial court held that Mr. Muhammad's argument regarding the statutory construction of § 19.2-264.3:1 was waived.  5 J.A. 10240.  The trial court concluded:

```
               I think this was a tactical decision on his
     part, much like his decision to represent himself at the
     beginning of the trial so that he could make an opening
     statement.  I think it's now just to the same kind of
     situation where counsel suggested to him that was not the
     appropriate decision to make.  He made that decision and I
     think he's got to bear the consequences of it.

               I think the appropriate consequence is the one
     that I imposed, that he not be allowed to use his
     psychological and psychiatric testimony.

               I admit that in the context of this case, and
     certainly what you've just told me, it was a harsh
     consequence to his case, but I think he understood the
     consequences and he made that decision and I think he's


     got to bear it.
```

22 J.A. 10244-45.

*Direct appeal*

On direct appeal, Mr. Muhammad argued to the Supreme Court of Virginia that exclusion of the experts violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.  F.H.A. 76-80.  In support of his Eighth Amendment argument, Mr. Muhammad cited *Penry v. Lynaugh*, 492 U.S. 302 (1989), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982).  In support of Fifth and Sixth Amendment claim, he cited *Taylor v. Illinois*, 484 U.S. 415 (1988).  F.H.A. 78.  In support of

these arguments, Mr. Muhammad explained the prejudice he suffered from the trial court's exclusion sanction, and the fact that the Commonwealth was not entitled to an evaluation under the plain language of Va. Code § 19.2-264.3:1.  F.H.A. 79-80.

The Supreme Court of Virginia split Mr. Muhammad's claims into fragments and dealt with them piecemeal.  Strangely, the court did not even cite *Penry*, *Eddings*, and *Taylor*, much less analyze Mr. Muhammad's claims in light of those firmly established Supreme Court precedents.

Initially, the Supreme Court of Virginia "[c]onsider[ed] the Commonwealth's right to an evaluation of Muhammad," even though this argument in support of the constitutional claims was not a separate Assignment of Error.  The court held that this argument in support of Mr. Muhammad's claim was waived in the trial court, and would not be considered on appeal. *Muhammad I*, 619 S.E.2d at 47.

The Supreme Court of Virginia showed a fundamental misunderstanding of the record by writing, "Only after all the evidence was presented at the sentencing phase and both parties rested their case did Muhammad offer an affidavit as a proffer of Dr. Cunningham's testimony." *Id.*  In fact, the Supreme Court of Virginia was flatly wrong; Mr. Muhammad provided the trial court with Dr. Cunningham's proffer prior to opening statements, and later provided a second affidavit.  F.H.A. 57-70, 1649-50.  This error colored the remainder of the court's analysis.  After repeating that "Muhammad did not avail himself of the opportunity," the court concluded, "The trial court's ruling was not unreasonable, especially considering that it was willing to consider expert testimony from Dr. Cunningham, not based upon interviews with Muhammad, but Muhammad did not avail himself of the opportunity."  *Muhammad I*, 619 S.E.2d at 48.

*State habeas*

On state habeas, Mr. Muhammad again argued that the court improperly excluded his expert evidence, F.H.A. 1071 and the court held this argument had already been addressed on direct appeal.  646 S.E.2d at 194.  Mr. Muhammad also raised a separate claim: that counsel was ineffective for not adequately arguing for the inclusion of his mental health expert testimony at the penalty phase.  F.H.A. 1071.  The Supreme Court of Virginia did not directly rule on this claim.  *See* 646 S.E.2d at 193-94.

> ### A.  The trial court violated Mr. Muhammad's Eighth and Fourteenth Amendment rights to a reliable sentencing proceeding by excluding expert mental health testimony.

Since the reinstatement of the death penalty, it has been a bedrock principle that a state seeking the death penalty must allow the jury to consider and give effect to all relevant mitigating evidence.  Here, the trial court barred Mr. Muhammad from presenting relevant, persuasive evidence from Dr. Cunningham justifying a sentence less than death.  The trial court thus committed a textbook *Lockett-Eddings* error which requires the grant of the writ of habeas corpus.

In *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion), the Supreme Court held that the Eighth and Fourteenth Amendments require that the sentencing jury may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  In *Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982), the plurality opinion ripened into a holding of the Court.  "There is no dispute as to the precise holding in each of the two cases: that the State cannot bar relevant mitigating evidence from being presented and considered during the penalty phase of a capital trial."  *Saffle v. Parks*, 494 U.S. 484, 490 (1990).

There can be no doubt that Dr. Cunningham's testimony went to relevant mitigating evidence.  Relevant mitigating evidence is simply evidence that makes more or less probable the existence of any fact that might warrant a sentence less than death.  *Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004); *McKoy v. North Carolina*, 494 U.S. 433, 440-41 (1990).  Indeed, the Supreme Court has defined "[e]vidence of a difficult family history and of emotional disturbance" as "relevant mitigating evidence."  *Eddings*, 455 U.S. at 115.  The Fourth Circuit has explained that testimony admissible under the *Lockett-Eddings* principle "includes evidence of a defendant's troubled upbringing, as well as evidence bearing on whether the defendant will pose a danger in the future."  *Boyd v. French*, 147 F.3d 319, 325 (4th Cir. 1998).

The defense repeatedly invoked the protections of *Lockett*, *Eddings*, and other clearly established Supreme Court precedent in Mr. Muhammad's trial.  Even in the face of this clear authority, the trial court excluded Dr. Cunningham's testimony.  9 J.A. 4084-85; 14 J.A. 6443-47; 22 J.A. 10244-45.  This ruling was a stark error which flies in the face of the foundational principles of a reliable capital punishment determination.

The trial court's fundamental mistake was applying its reading of Va. Code § 19.2-264.3:1 instead of Eighth Amendment principles.  These principles, in conjunction with the Fourteenth Amendment, "may require the admission of mitigating evidence even if state-law rules of evidence (*e.g.*, hearsay) would exclude it."  *Boyd*, 147 F.3d at 325-26.  No decision of the Supreme Court creates an exception to *Lockett* and *Eddings* to allow exclusion of relevant mitigation evidence for violation of a statutory scheme.  To the contrary, "the Supreme Court has been very sensitive to any impediment to the consideration of any type of mitigating evidence in a death sentencing hearing."  *Hutchins v. Garrison*, 724 F.2d 1425, 1437 (4th Cir. 1983).

32

The Supreme Court of Virginia totally ignored *Lockett* and *Eddings*, and their principles, in its decision.  The court's analysis resulted in a decision that was contrary to and involved an unreasonable application of *Lockett*, *Eddings*, and their many progeny.  Furthermore, the court's decision was based on an unreasonable determination of the facts in light of the record before the Supreme Court of Virginia because it based its ruling on its mistaken belief that Mr. Muhammad did not submit the October 14, 2003 statement of Dr. Cunningham to the trial court.  Thus, this Court should grant a writ of habeas corpus.

**B.   The trial court violated Mr. Muhammad's Fifth, Sixth, and Fourteenth Amendment rights to present a defense by excluding expert mental health testimony.**

In addressing a court's exclusion of defense witnesses, the Supreme Court has explained that, "Few rights are more fundamental than that of an accused to present witnesses in his own defense.  Indeed, this right is an essential attribute of the adversary system itself."  *Taylor v. Illinois*, 484 U.S. 400, 409 (1988) (citation omitted).  In situations such as these, where Mr. Muhammad's right to call witnesses and his refusal to participate in Dr. Dietz' examination come into direct conflict, the Supreme Court has called for a balancing of interests on the facts of the case.  *Taylor*, 484 U.S. at 415.  In addition to objecting to the exclusion of his expert on Eighth Amendment grounds, Mr. Muhammad also argued that the sanction of exclusion was too severe under the facts of his case. F.H.A. 6.

The exclusion of a witness violates a defendant's Sixth Amendment rights when the exclusion is arbitrary or disproportionate to the purposes it is designed to serve.  *See United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Rock v. Arkansas*, 483 U.S. 44, 56 (1987); *cf. Quinn v. Haynes*, 234 F.3d 837, 848-49 (4th Cir. 2000) (applying proportionality test in evaluating rape shield statute).  "The proportionality test of *Rock* [thus] measures the restrictions on a

defendant's right to present a defense against the 'purposes they are designed to serve.'" *Ferensic v. Birkitt*, 501 F.3d 469, 476 (6th Cir. 2007) (quoting *Rock*, 483 U.S. at 56).  A variety of factors demonstrate that the extreme penalty of exclusion violated Mr. Muhammad's Fifth and Sixth Amendment rights.

In applying this proportionality test, sanctions less extreme than preclusion will be "adequate and appropriate in most cases."  *Taylor*, 484 U.S. at 413; *see also Michigan v. Lucas*, 500 U.S. 145, 152 (1991).  "Stated differently, the exclusion of a defendant's evidence should be reserved for only those circumstances where 'a less severe penalty would perpetuate rather than limit the prejudice to the State and the harm to the adversary process.'"  *Ferensic*, 501 F.3d at 476 (quoting *Lucas*, 500 U.S. at 162) (second internal quotation marks omitted).  As a matter of balance, the exclusion of all sentencing experts, on any topic, is facially disproportionate as a sanction for refusing to cooperate with Dr. Dietz' limited evaluation under Va. Code § 19.2-264.3:1.  The Commonwealth's right to examine a defendant derives from its right to rebut psychiatric evidence, *Buchanan v. Kentucky*, 483 U.S. 402, 423 (1987), but the trial court's exclusion order went far beyond what was necessary to achieve balance.

*The purposes of 3:1*

Exclusion of Dr. Cunningham was disproportionate to the purposes of Va. Code § 19.2-264.3:1; in fact, it did not serve those purposes at all.  Dr. Cunningham was not appointed under that statute, and did not address the "mental condition at the time of the offense" that is the justification for a Commonwealth evaluation.

In the ordinary case, a defendant seeks appointment of a mental health professional pursuant to § 19.2-264.3:1(A) to address the three categories of mitigation evidence identified in the statute: "(i) whether the defendant acted under extreme mental or emotional disturbance at

the time of the offense; (ii) whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was significantly impaired at the time of the offense; and (iii) whether there are any other factors in mitigation relating to the history and character of the defendant or the defendant's mental condition at the time of the offense."  The defendant gives notice (per subsection E) of his intent to present testimony from the mental health professional "to support a claim in mitigation relating to the defendant's history, character or mental condition."  The defendant then typically turns over the expert's report (per subsection D), which contains all of the appointed expert's conclusions.  The Commonwealth normally requests an evaluation of the defendant's "mental condition at the time of the offense" under subsection F, retains an expert, and the evaluation takes place or not, depending on the defendant's cooperation.

Mr. Muhammad's case was radically different from this typical model.  Mr. Muhammad asked for the appointment of Dr. Stejskal and Dr. Ryan under § 19.2-264.3:1.  1 J.A. 52-54; S.F.H.A. 1.  But Mr. Muhammad did not seek the appointment of Dr. Cunningham under § 19.2-264.3:1; he was independently retained.  If Mr. Muhammad had never asked for the appointment of Dr. Stejskal and Dr. Ryan, Dr. Cunningham could have testified without any notice or discovery to the Commonwealth.  One purpose of § 19.2-264.3:1 is to compel disclosure by experts obtained at Commonwealth expense, but Dr. Cunningham's services were not obtained at Commonwealth expense.  *See People v. Mayes*, 202 Cal. App. 3d 908, 919, 248 Cal. Rptr. 899, 906 (Cal. Ct. App. 1988) (holding unconstitutional a trial court's exclusion of a retained expert as a sanction for failure to cooperate with an appointed expert).

Mr. Muhammad did not provide a typical 3:1 notice.  Instead of giving notice of the full range of mitigation evidence under § 19.2-264.3:1, Mr. Muhammad strictly limited his 3:1 notice

to indicate that he would not rely on any evidence of Mr. Muhammad's mental condition at the time of the offense.  S.F.H.A. 41; 8 J.A. 3372-73.  In fact, Mr. Muhammad invoked his Fifth Amendment right against self-incrimination with respect to the time of the offense.  S.F.H.A. 41; 8 J.A. 3372-73.

The report-disclosure provisions of subsection D did not play their usual role because § 19.2-264.3:1 only requires disclosure of a report from an expert appointed pursuant to the statute. Mr. Muhammad disclosed the 3:1 report to the Commonwealth, as directed by the trial court. F.H.A. 1346; F.H.A. 1336-45.  But neither § 19.2-264.3:1 nor any other statute required disclosure of the substance of Dr. Cunningham's testimony.  Mr. Muhammad did provide the Commonwealth with the substance of Dr. Cunningham's testimony on September 24, 2003, but he did so in the interest of fairness rather than under compulsion of the statute. F.H.A. 1357.  It was not, therefore, one of the purposes of § 19.2-364.3:1 to provide the Commonwealth with information about Dr. Cunningham or his testimony; Dr. Cunningham was entirely outside the statute's ambit at this point.

Most importantly, Dr. Dietz' evaluation was unrelated to the evaluation called for by § 19.2-264.3:1(F)(1).  That subsection allows the Commonwealth to "seek[] an evaluation concerning the existence or absence of mitigating circumstances *relating to the defendant's mental condition* at the time of the offense." (Emphasis added.)  Mr. Muhammad had specifically provided notice that he would *not* introduce evidence of his mental condition at the time of the offense.  S.F.H.A. 41; 8 J.A. 3372-73.  The trial court ordered that Mr. Muhammad did not need to answer questions about the time of the offense.  5 J.A. 1966; 9 J.A. 4027.

The evaluation which Dr. Dietz sought to perform, therefore, was not for the purpose enumerated in § 19.2-264.3:1.  The statutory purpose is limited to evaluations of "the

36

defendant's mental condition at the time of the offense," but Dr. Dietz could not, by court order, inquire into Mr. Muhammad's mental condition at the time of the offense. When the trial court excluded Dr. Cunningham's testimony as a sanction for refusing to cooperate with Dr. Dietz, the court was not protecting the policies of the statute because Dr. Dietz' evaluation was not of the type envisioned by the statute. Dr. Cunningham's exclusion was disproportionate to the purpose it was intended to serve, because it did not actually accomplish the policies set forth in Code § 19.2-264.3:1.

*Level playing field*

Mr. Muhammad's refusal to cooperate did not prejudice the Commonwealth in any way. Even if Mr. Muhammad had fully cooperated with the Commonwealth, the defense could not have introduced expert testimony based on Mr. Muhammad's statements because of Virginia's minority hearsay rule. Dr. Cunningham made unambiguously clear that he would not rely on any statements of Mr. Muhammad. Furthermore, Dr. Dietz had testified in the past without interviewing the defendant, and explained that he could do so again. Even after Mr. Muhammad's refusal to cooperate, the parties were on a level playing field.

Mr. Muhammad's two interviews with Dr. Cunningham provided no advantage to the defense, because Dr. Cunningham could not rely on those statements under Virginia law regardless of what happened afterward. Federal Rule of Evidence 703 allows an expert to base his or her opinion on facts or data not in evidence if those facts or data are "of a type reasonably relied upon by experts in the particular field." Virginia follows this rule in civil cases, *see* Va. Code § 8.01-401.1, but not in criminal cases. *Simpson v. Commonwealth*, 318 S.E.2d 386, 391 (Va. 1984). In criminal cases, an expert is not "permitted to base his opinion on facts not in

evidence." *Id.* As the defense repeatedly explained, Dr. Cunningham could not rely on Mr. Muhammad's out-of-court statements whether or not he cooperated with Dr. Dietz.

Dr. Dietz explained under oath that he had previously testified about defendants whom he had not interviewed.  9 J.A. 4069.  (After Mr. Muhammad's trial, Dr. Dietz continued his practice of testifying about defendants without interviewing them.  F.H.A. 1397).  In his affidavit to the trial court, Dr. Dietz confirmed this statement and explained, "Where the defendant and an important proximal witness are unavailable for personal interview, as here, the expert must rely exclusively on other sources of data such as recorded statements in police or mental health interviews, testimony, or elsewhere; reports detailing their statements; or other evidence of the defendant's life history and behavior, including motivations, thoughts, and feelings."  F.H.A. 98. He went on to explain that, "Reliance on sources of information other than the defendant's statements is proper."  F.H.A. 98.  Dr. Dietz never said that Mr. Muhammad's failure to cooperate would inhibit his ability to give an opinion.  In fact, because Mr. Malvo, whom Dr. Dietz described as "an important proximal witness," was unavailable regardless of Mr. Muhammad's actions, Dr. Dietz would have been relying on the records whether Mr. Muhammad cooperated or not.

The apparent basis for the trial court's ruling was concern about inadvertent reliance on Mr. Muhammad's statements.  14 J.A. 6445-46.  The record clearly establishes that such reliance would not have occurred in this case.  Dr. Cunningham wrote in his affidavit to the trial court that "it is no challenge to set aside the history obtained from Mr. Muhammad, and instead rely on the history that I obtained through interviews of third parties, review of records, and testimony of witnesses at trial."  F.H.A. 61.  He explained in detail that because his analytical method drew almost nothing from a personal interview, exclusion of the personal interview had no effect on

38

his testimony.  62.  Both Dr. Cunningham and Dr. Dietz explained that they had testified while excluding consideration of a defendant's testimony in other cases.  F.H.A. 98;   Dr. Dietz suggested addressing the possibility of inadvertent reliance by appropriate safeguards.  F.H.A. 98.

It was suggested that trial that Dr. Dietz might not be available for the penalty phase, 14 J.A. 6444-45, but this idea turned out to be untrue.  Prior to traveling to Virginia to interview Mr. Muhammad, Dr. Dietz had already performed $33,282.19 in billable work.  F.H.A. 1238.  Dr. Dietz continued to prepare for the penalty phase after his attempt to interview Mr. Muhammad. On October 10, 2003, Dr. Dietz billed the trial court for his travel and for "complet[ing] report for Mr. Ebert."  F.H.A. 1239.  On November 15, 2003, Dr. Dietz billed the court for his time spent in "Rescheduling the next two weeks."  F.H.A. 1239.  He also billed the court $3000 on November 18, 2003 for his "Canceled trip to Virginia."  F.H.A. 1239.  In his November 20, 2003 bill, submitted just after the close of penalty phase evidence, Dr. Dietz stated his total bill as $69,334.56.  F.H.A. 1238.  Clearly, Dr. Dietz was available to testify at the penalty phase and billed almost $70,000 for his preparations to do so.

Finally, if a concern was justified, Dr. Dietz outlined an effective alternative to exclusion in his affidavit.  Dr. Dietz asked the trial court the he "be permitted to explain to the jury why [he] did not examine Mr. Muhammad or interview Mr. Malvo."  F.H.A. 98.  He also requested that, if the trial court allowed the defense experts to testify, that his colleague Helen Mayberg, M.D. and he "be permitted the following access to data: (1) a neurological examination of the defendant by Dr. Mayberg if Dr. Pincus is permitted to rely on the findings of his examination of the defendant, (b) copies of any notes or reports of Dr. Pincus and Dr. Cunningham and any defense investigative reports or records provided to them that are not already in the possession of

the government, (c) copies of any raw test data such as brain images or EEG tracings relied upon by Dr. Pincus, and (d) either interviews with the aforementioned experts and family members (see paragraph 17) to be conducted in Virginia Beach between November 19 and December 23, 2003, or permission to attend their testimony between November 19 and December 23, 2003, or both." F.H.A. 99. This detailed alternative would have been effective to safeguard the rights of the Commonwealth, and demonstrates the unconstitutionality of the more severe exclusion sanction. *See Noble v. Kelly*, 246 F.3d 93, 99-100 (2nd Cir. 2001). The lack of prejudice to the Commonwealth demonstrates that exclusion was too severe a sanction. *See Ferensic*, 501 F.3d at 477-78.

The Supreme Court of Virginia totally ignored *Taylor* and its principles in its decision. The court's decision was contrary to and an unreasonable application of *Taylor* and its progeny. Furthermore, because the court based its holding on its mistaken view that Mr. Muhammad had not submitted Dr. Cunningham's October 14, 2003 statement, the decision was based on an unreasonable determination of the facts in light of the true state court record.

**C. In the alternative, if this Court concludes that the *Lockett-Eddings* and *Taylor* claims are procedurally defaulted, then the failure to adequately argue for the admission of Dr. Cunningham's testimony constitutes ineffective assistance of counsel.**

Mr. Muhammad's primary argument is that he did everything necessary to preserve and present his *Lockett-Eddings* and *Taylor* claims to the trial court and the Supreme Court of Virginia. Nevertheless, the Supreme Court of Virginia declined to consider some arguments in support of Mr. Muhammad's claims on the basis of alleged procedural deficiencies. In the alternative, if this Court determines that these alleged procedural deficiencies bar Mr. Muhammad's claims, then the failure to adequately argue for the inclusion of Dr. Cunningham's

testimony constitutes the ineffective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Strickland v. Washington*, 466 U.S. 668 (1984).

If Mr. Muhammad's attorneys failed to adequately argue for the admission of Dr. Cunningham's expert testimony, then this specific mistake fell below the standard of care demanded of attorneys in Virginia.  Mr. Muhammad's attorneys clearly found the arguments in support of Dr. Cunningham's testimony to be meritorious; they argued repeatedly for the admission of his testimony. *See, e.g.*, F.H.A. 2; 5 J.A. 2130; 14 J.A. 6440.  The standard of care clearly requires attorneys to advance arguments in a form in which their merits can be addressed by the court.  Mr. Muhammad's primary position is that the attorneys properly presented his constitutional claims and all of the arguments supporting that claim, but if they did not, such a failure would fall below the prevailing standard of care.

If Mr. Muhammad's attorneys' error forms the basis for this Court's refusal to consider his meritorious *Lockett-Eddings* or *Taylor* claim, then this error would be prejudicial.  The ineffective assistance of counsel under this claim would serve as an independent basis for relief as well as excusing the procedural default of the substantive claims. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986).

The reasonability provisions of 28 U.S.C. § 2254(d) are not applicable to this claim because the Supreme Court of Virginia did not adjudicate this claim on its merits. *See, e.g.*, *Hudson v. Hunt*, 235 F.3d 892, 895 (4th Cir. 2000).

II.  TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO OBJECT TO MR. MUHAMMAD'S SELF-REPRESENTATION ON THE GROUND THAT HE WAS NOT COMPETENT TO REPRESENT HIMSELF.

At the time Mr. Muhammad asked to represent himself, trial counsel failed to object and bring to the court's attention evidence that Mr. Muhammad was not competent to represent

41

himself.  To demonstrate ineffective assistance of counsel, Mr. Muhammad must show (1) that counsel's performance was deficient, and (2) that the deficiency prejudiced the defense. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Strickland v. Washington*, 466 U.S. 668 (1984).  Although the representation trial counsel provided Mr. Muhammad was in many respects exemplary, this specific failure to alert the court to Mr. Muhammad's incompetence constitutes ineffective assistance of counsel because it fell below an objective standard of reasonableness and prejudiced Mr. Muhammad severely.

### *State court proceedings*

On state habeas review, Mr. Muhammad argued that his trial counsel were ineffective for failing to object to his self-representation on the basis that he was incompetent to represent himself.  F.H.A. 1058, 1061, 1068-69.  The Court held that trial counsel's performance was not deficient and that Muhammad was not prejudiced by trial counsel's omission.  646 S.E.2d at 192-93.  In particular, the Supreme Court of Virginia ruled that, "Petitioner fails to point to expert evidence, available at that time, upon which counsel could have relied and which would have established that petitioner's ability to make decisions and understand the proceedings was impaired.  The trial transcript demonstrates that counsel found petitioner to be 'a very bright man' and petitioner has failed to proffer any evidence to the contrary." *Id.* at 192.

### *Argument*

Because a defendant has both the right to counsel and the right to self-representation, dealing with a defendant who seeks to represent him- or herself is always a complex matter.  *See, e.g.*, *United States v. Frazier-El*, 204 F.3d 553, 558-59 (4th Cir. 2000).  Complexity notwithstanding, however, it is imperative for the trial court and counsel to ensure that a waiver of counsel is made knowingly, voluntarily, intelligently, and competently.  Here, trial counsel

made an error of constitutional magnitude by failing to object to the self-representation on the basis that Mr. Muhammad was not competent to represent himself.

After the jury was empanelled, but before opening statements, Mr. Muhammad asked to represent himself. 12 J.A. 5224.  Mr. Muhammad explained that he wished to represent himself "[b]ecause I feel like I can speak better on my behalf,"  12 J.A. 5225, and "[b]ecause I know me, and I know what happened, and I know what didn't happen."  12 J.A. 5226.

The trial court asked Mr. Muhammad a series of questions inquiring as to why Mr. Muhammad thought he could represent himself.  12 J.A. 5228-29.  The trial court continued to ask Mr. Muhammad why he believed he could represent himself, and contrasted his inexperience with the extensive experience of trial counsel.  12 J.A. 5229-30.

The trial court warned Mr. Muhammad that he would have to comply with the rules of evidence, and that he would not get special treatment.  12 J.A. 5232.  The court also warned Mr. Muhammad that he was making a "tremendous mistake" in representing himself, given the immense complexity of the case.  12 J.A. 5233.  The trial court then addressed trial counsel:

```
          THE COURT:  You've spent months and months
     with him.  Do you think that he can competently
```

represent himself?

MR. GREENSPUN:  Judge, you're asking me a
question that's contrary to what I think is in
his best interest.  I can tell you this, that all
attorneys don't send their clients every piece of
paper in the case.  Mr. Muhammad has had every
pleading, every correspondence, every everything
from the beginning; and I'm satisfied that he
doesn't just put them in a pile in the corner of
his cell, that he has reviewed them; and I do not
believe that he has the -- the courtroom skills
necessary to match seventy or so years of
prosecutorial experience, including many, many
capital cases and the backup of the task force
and all that kind of thing that these prosecutors
have; so I don't think that Mr. Muhammad has the
skills to do that -- legal skills to do
that -- but that's not the end of the question
though for the court I don't think.

THE COURT:  Will you switch places with
Mr. Shapiro?

MR. SHAPIRO:  I can't add very much except
to say that there's some confusion about what our
duty is at this point.  Mr. Muhammad wants to
represent himself, and it may be that we should

44

```
                    help him accomplish that goal.  There is -- I
                    think Mr. Greenspun and I have both found him to
                    be a very bright man; and as Mr. Greenspun has
                    said, we -- he's had the benefit of every piece
                    of paper we've gotten and has gone over most of
                    it with us; so he's certainly familiar with the
                    parameters of the case.  It is a discretionary
                    matter, we think, with the court at this time;
                    and my personal view, as we've expressed to

                         Mr. Muhammad, is that this is a mistake.
```

12 J.A. 5235-36.

The trial court concluded its colloquy by confirming that Mr. Muhammad wanted to represent himself and that he understood the court thought it was a mistake.  12 J.A. 5240-41. The trial court then ruled, "I'm going to grant your motion and allow you to represent yourself.  I am going to direct that Mr. Greenspun and Mr. Shapiro be standby counsel, that they assist you in every aspect in the case; but they cannot represent you any longer.  You are going to be the one representing yourself; and I am going to inform the jury that that is in fact, the position of the case." 12 J.A. 5242.

A defendant, of course, has a Sixth Amendment right to represent himself.  *Faretta v. California*, 422 U.S. 806, 807 (1975).  To invoke this right, a defendant must make a knowing, voluntary, and intelligent waiver of the right to counsel, as well as be competent to represent himself. *Godinez v. Moran*, 509 U.S. 389, 400-01 (1993).  The test of competency is whether "a criminal defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding

of the proceedings against him.'" *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).  Even for a represented defendant, competency is important because "the defendant also is called upon to make myriad smaller decisions concerning the course of his defense.  The importance of these rights and decisions demonstrates that an erroneous determination of competence threatens a fundamental component of our criminal justice system – the basic fairness of the trial itself."  *Cooper v. Oklahoma*, 517 U.S. 348, 364 (1996) (internal quotation marks omitted).

Prior to the time Mr. Muhammad asked to represent himself, trial counsel had a wealth of information that they should have presented to the trial court to demonstrate that Mr. Muhammad was not competent to represent himself and/or that sufficiently alerted them that they should have inquired further into Mr. Muhammad's competence.  This information included consistent opinions of mental health professionals based on examinations, MRI scans of Mr. Muhammad's brain, and neuropsychological testing that all pointed to the same problem: structural and functional brain abnormality.

### Dr. Dorothy Otnow Lewis

Trial counsel asked psychiatrist Dr. Dorothy Otnow Lewis of Yale University to evaluate Mr. Muhammad.  F.H.A. 1417.  On September 9 and 10, 2003, Dr. Lewis, along with a colleague, interviewed Mr. Muhammad. F.H.A. 1417. She also reviewed portions of Mr. Muhammad's military and medical records. F.H.A. 1417.  In her declaration, Dr. Lewis explains:

In September 2003, I concluded that Mr. Muhammad was not competent to stand trial or represent himself.  In other words, I concluded to a reasonable degree of psychiatric certainty that Mr. Muhammad did not have a present ability to consult with his lawyer with a reasonable degree of rational understanding and did not have a rational as well as a factual understanding of the proceedings against him.  Mr. Muhammad's ability to sometimes show a superficial brightness does not detract from or contradict my contemporaneous opinion that he was not competent to stand trial or represent himself in the autumn of 2003.

.

F.H.A. 1417.  She continues:

In September 2003, I explained to at least one of Mr. Muhammad's trial attorneys that Mr. Muhammad was not competent to stand trial.  As early as September 2003, I could have offered the court expert evidence which would have established that Mr. Muhammad's ability to make decisions and understand the proceedings was impaired.  If asked under oath in October 2003, I would have

testified that Mr. Muhammad's judgment and ability to think logically were severely compromised and that he was unable to rationally understand or appreciate the nature of the evidence connecting him to the offenses in question.  I would also have testified that Mr. Muhammad did not have a present ability to consult with his lawyer with a reasonable degree of rational understanding and did not have a rational as well as a factual understanding of the proceedings against him.  If asked about his capacity to represent himself, I would have testified that Mr. Muhammad was not competent to represent himself.

F.H.A. 1417-18.

*MRI Brain Scan*

In addition to Dr. Lewis, trial counsel had obtained an MRI of Mr. Muhammad's brain on August 26, 2003.  F.H.A. 1357-59.  This MRI showed three serious malformations a) an abnormal shortening of the corpus callosum; b) a shrunken cortex; and c) a cavum septum pellucidum.  These defects are apparent to the naked eye.

First, Mr. Muhammad's August 2003 MRI showed an abnormal shortening of the corpus collosum, as shown in the following comparison.



Studies indicate that while congenital abnormalities of the corpus callosum are rare,[5] there is a statistical correlation in schizophrenic patients.[6] F.H.A. 1563.  The corpus callosum is the largest connective pathway in the human brain, made up of more than 200 million nerve fibers that connect the left and right hemispheres.[7] Research suggests that people with a corpus

---

[5] G.P. Ramelli et al., *The prognosis of agenesis of the corpus callosum might mostly be favourable*, 136 Swiss Med. Weekly 404 (2006).

[6] L.K. Paul et al., *Agenesis of the corpus callosum: Genetic, developmental and functional aspects of connectivity*, 8 Nature Reviews 287 (2007).

[7] National Organization for Disorders of the Corpus Callosum, *What is the corpus callosum?* (2006), retrieved February 26, 2008 from http://www.nodcc.org/what_is_the_corpus_callosum.php.

callosum defects can have inappropriate emotional expression and are unable to grasp long-term consequences of a situation.[8]

Second, Mr. Muhammad's MRI showed a shrunken cortex, as shown in the following comparison.



The shrunken cortex is unequivocal evidence of the loss of brain tissue. The loss of brain tissue such as this is most likely through a severe injury, which is further supported by the record evidence that Mr. Muhammad was severely beaten as a child. *See e.g.,* F.H.A. 1477-83. Such a severe injury resulting in the loss of brain tissue at the back of the brain is typically associated with a coup-contrecoup pattern with concomitant injury to the frontal lobes, and damage elsewhere in the brain.

---

[8] Raine, A., Buchsbaum, M. & LaCasse, L., *Brain abnormalities in murderers indicated by positron tomography*, 42 Biological Psychiatry 495 (1997).

Third, Mr. Muhammad's August 2003 MRI showed a cavum septum pellucidum, as shown in the following comparison.



The cavum septum pellucidum is the space found within the septum pellucidum, which is a thin, transparent membrane structure that separates the lateral ventricles.[9] It is considered to be part of normal development in early years, closing in 15% of humans within 1 month of birth, and closing in 85% of humans within 6 months after birth. However, if the cavum septum pellucidum still persists into adulthood it is highly correlated with neurodevelopment anomalies of the midline structures.[10] There is a remarkable statistical relationship between having a cavum septum pellucidum and atypical psychoses and schizophrenia.  F.H.A. 1563.

*Neuropsychological Testing*

---

[9] S.S. Wolf et al., *Malformations of the septum pellucidum: Two distinctive cases in association with schizophrenia*, 19 J. Psychiatry & Neuroscience 140 (1994).

[10] J.S. Kwon et al., *MRI study of cavum septi pellucid in schizophrenia, affective disorder, and schizotypal personality disorder*, 155 Am. J. Psychiatry 509 (1998); J.R. Llesuy, *Cavum septum pellucidum in schizophrenia: A case report*, 35 Actas Esp Psiquiatr 400 (2007).

In addition to the opinion of Dr. Lewis and the MRI of Mr. Muhammad's brain, on June 20, 2003, trial counsel's 3:1 expert, Dr. William Stejskal, conduct neuropsychological testing that showed that Mr. Muhammad had severe impairments.   Trial counsel knew of Mr. Muhammad's neurological impairments.   F.H.A. 1357-59.   The topographic display below illustrates Mr. Muhammad's impairments in a mathematical model of Dr. Stejskal's neuropsychological data.



This image demonstrates the extent of neurological damage to Mr. Muhammad's brain. As can be seen in this image, Mr. Muhammad is most severely impaired in tasks that require the integrity of the posterior portions of his brain, as well as frontal regions, right worse than left.

F.H.A. 1593.   Behavioral domains affected by damage to these regions include executive functions. *Id.* Executive functions are brain related abilities involved in the initiation, inhibition, monitoring and shifting of behaviors.

*IQ Testing*

As part of the psychological testing administered by Mr. Muhammad's 3:1 expert, Mr. Muhammad took an IQ test: the WAIS-III.   F.H.A. 1335-45.   Mr. Muhammad's 3:1 expert issued a report dated September 22, 2003, that described Mr. Muhammad's performance as "below the level of performance obtained by approximately 73 percent of other men his age." *Id.*   Contrary to counsel's compliment to Mr. Muhammad that he was "very bright," incontrovertible testing showed that Mr. Muhammad was below average.

The Supreme Court of Virginia found that Counsel's failure to bring the issue of Mr. Muhammad's competency to the trial court did not amount to ineffective assistance of counsel because of a lack of evidence of incompetence pre-trial.   Contrary to the state court finding, there was a trove of evidence available to trial counsel pre-trial, and most of it was already in their hands.

Further, all the information available to trial counsel should have alerted them that Mr. Muhammad was incompetent for an additional reason: it all presented different facets of the same problem: that Mr. Muhammad had severe problems with his thinking processes, perception, judgment, and impulsiveness.   Dr. Lewis' clinical evaluation and diagnoses, the MRI of Mr. Muhammad's brain, and the neuropsychological testing data all confirmed that Mr. Muhammad had both abnormal brain structure and functional brain abnormality.   Rather than being disparate diagnoses, this evidence was synergistic in that it all confirmed and supported the

52

other diagnoses that showed that Mr. Muhammad's brain abnormalities and function impinged on his competency.

The failure to alert the trial court to Dr. Lewis' opinion, the malformations evidence in the MRI, the neuropsychological testing data, and the IQ test fell below contemporary objective standards of representation. In the area of their client's competency, defense counsel have a special duty to ensure their client's competency. Defense counsel are burdened with the task of raising mental health issues when there is reasonable cause to suspect incompetency. *See Proffitt v. United States*, 582 F.2d 854, 858 (4th Cir. 1978) (holding that failure to pursue an insanity defense was ineffective). In this area, the duty of counsel to ensure competency supersedes their duty of loyalty to the client's wishes. *See United States v. Johnson*, 527 F.2d 1104, 1106 (4th Cir. 1975) (holding that a court should grant counsel's motion for a competency determination when there is reasonable cause to do so even if the defendant opposes it personally).

Counsel's failure to raise the issue of Mr. Muhammad's competency severely prejudiced him. If examined for competency, there is substantial reason to believe that Mr. Muhammad would not have been found competent to represent himself. First, Dr. Lewis has clearly expressed her contemporaneous opinion that Mr. Muhammad was not competent. F.H.A. 1126-27. Second, the combination of the brain malformations shown on the MRI and topographical display of the neuropsychology data would have been unimpeachable proof of a severe mental health disorder. Finally, neuropsychiatrist Dr. David Williamson, retained by the Maryland Public Defender, later "developed substantial concerns that Mr. Muhammad was mentally ill and was not competent to stand trial." F.H.A. 1169. Dr. Williamson was not able to complete to collateral interviews he felt were necessary to reach a diagnosis, if any. F.H.A. 1170. If the information above were thought by anyone to be insufficient to find Muhammad incompetent,

certainly it is sufficient to put counsel on notice that they should have further investigated Mr. Muhammad's competency.

Mr. Muhammad's self-representation, even over a relatively short time, mattered in the outcome of the trial: during his self-representation, the Commonwealth presented 18 witnesses, including the critical "sniper expert" Mark Spicer, without substantial opposition from the defense. And, of course, if Mr. Muhammad had been found incompetent to represent himself he would have also been found incompetent to stand trial, until and unless his competency was restored.

The trial court, and the Supreme Court of Virginia relied solely on the challenged statement of counsel, without taking into account any of the information above.  Accordingly, the state Supreme Court's decision is contrary to and an unreasonable application of federal law governing competency and ineffective assistance of counsel, as well as an unreasonable determination of the facts in light of the evidence in the state court record.

III. THE COMMONWEALTH OF VIRGINIA UNCONSTITUTIONALLY PURSUED INCONSISTENT THEORIES OF PROSECUTION AGAINST MR. MUHAMMAD AND HIS CO-DEFENDANT MR. MALVO.

Although the Commonwealth need not be entirely consistent in its separate prosecutions of co-defendants, the Commonwealth violated Mr. Muhammad's right to due process by taking materially inconsistent positions on an issue at the core of the case against him and his co-defendant Lee Boyd Malvo: whether Mr. Muhammad controlled Mr. Malvo.  In the prosecution of Mr. Muhammad, the Commonwealth advocated the position that Mr. Muhammad controlled Mr. Malvo to attempt to prove the "direction or order"  required by Va. Code § 18.2-18.  In the prosecution of Mr. Malvo, the Commonwealth advocated the position that Mr. Muhammad did

not control Mr. Malvo to attempt to rebut Mr. Malvo's brainwashing claim.  The Due Process Clause does not countenance such an inconsistency.

### State court proceedings

Muhammad argued, by both pre-trial and by post-trial motions, that his due process rights were violated by the materially inconsistent positions taken by the Commonwealth in his trial and the trial of Lee Boyd Malvo.  1 J.A.  291-300, 6 J.A. 2336-42, 7 J.A. 2921-27, 2936-41, 2943-44.  The trial court denied Muhammad's pre-trial motion orally and by written order.  1 J.A. 685, 7 J.A. 2944-46.  The trial court denied Muhammad's post-trial motion by written order. 6 J.A. 2395-96.  This issue was presented on direct appeal.  F.H.A. 339-42.  The Supreme Court of Virginia rejected the argument on its merits, holding that the theories of prosecution in both trials were consistent.  619 S.E.2d at 37-38.

### Argument

The Fourth Circuit has explained, "In some situations, the Due Process Clause prohibits the government from presenting mutually inconsistent theories of the same case against different defendants.  For example, due process may be violated if 'an inconsistency exist[s] at the *core* of the prosecutor's cases against the defendants for the same crime, or where the evidence used at the two trial is 'factually inconsistent and irreconcilable.'"  *United States v. Higgs*, 353 F.3d 281, 326 (4th Cir. 2003) (citations omitted); *see also Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000); *Thompson v. Calderon*, 120 F.3d 1045, 1055 (9th Cir. 1997) (Fletcher, J., writing for an en banc plurality), *rev'd on other grounds*, 523 U.S. 538 (1998); *Drake v. Kemp*, 762 F.2d 1449, 1470 (11th Cir. 1985) (Clark, J., concurring).  Such a due process violation also occurs when the government uses inconsistent theories to seek the death penalty.  *In re Sakarias*, 106 P.3d 931, 943 (Cal. 2005).

The core inconsistency between the theory of the Commonwealth in prosecuting Mr. Muhammad and the theory of the Commonwealth in prosecuting Mr. Malvo is the relationship between the two co-defendants.  In seeking to prove that Mr. Muhammad directed and ordered Mr. Malvo by circumstantial evidence, the Commonwealth argued that Mr. Muhammad controlled Mr. Malvo.  In seeking to rebut Mr. Malvo's claim that Mr. Muhammad brainwashed him, the Commonwealth argued that Mr. Malvo was an equal partner of Mr. Muhammad.

In Mr. Muhammad's trial, the Commonwealth repeatedly argued that Mr. Muhammad was in charge.  This argument was at the core of the Commonwealth's presentation because, lacking evidence that Mr. Muhammad directed or ordered Mr. Malvo to shoot, it tried to establish that the nature of the relationship must have meant that Mr. Muhammad directed or ordered Mr. Malvo to shoot.   In the rebuttal closing argument of the guilt phase, the Commonwealth argued:

> He takes a young man from there.  It's
> about as far away from here as you can get up in
> the northwestern part of this country; and they
> go to -- a mission is the first that we know
> about.  They go and they train physically.  They
> go to the gym almost daily.  He is in the
> dominant position even there.  And, folks, you
> know -- and use your common sense -- in wartime
> the Army brings in young folks.  We want young
> soldiers because they're the kind of folks that
> you can mold and train and send into combat,
> people that don't really realize the consequences
> of death or what death means.  There is a young

```
                    man, I suggest to you, that he molded and made an

                    instrument of death and destruction.
```

19 J.A. 8928; *see also* 19 J.A. 8925, 8927.

In contrast, the Commonwealth argued in prosecuting Mr. Malvo that he was a full and equal partner in the crimes, under no one's control.  In the closing arguments of the guilt phase, the Commonwealth argued, "We make no excuse for John Muhammad.  He's as bad as he is.  For all intents and purposes, they're peas in a pod.  The only difference is he's younger, but their willingness to kill and their willingness to do it for money is common to both of them." F.H.A. 1677.  To rebut Mr. Malvo's claim that he was "a pawn molded like a piece of clay," F.H.A. 1717, the Commonwealth turned to the so-called "Pac-Man" letters: "Members of the jury, if you have any doubt, read the letters that the new Malvo wrote after August of the year 2003.  Read them.  You will have them in the jury room.  Commonwealth's 233: 'All I need is a gat.  Hey, ten years from now if we meet again, can you get hold of them gats when you get out?  Because then we can – we can make some quick paper and leave to your mother's homeland with about 1 mil apiece.'" F.H.A. 1720.

These conflicts are not superficial.   Because of the critical importance of the Commonwealth's theme that Mr. Muhammad controlled Mr. Malvo to the terrorism conviction, the control issue goes to the core of the Commonwealth's case.  The Commonwealth's "use of inherently factually contradictory theories violates the principles of due process."  *Smith*, 205 F.3d at 1052.  The Supreme Court of Virginia's decision that no constitutional inconsistency existed is an unreasonable application of the law and an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

## IV. THE CHARGING DOCUMENT FAILED TO ALLEGE FACTS SUFFICIENT TO IMPOSE THE DEATH PENALTY AGAINST MR. MUHAMMAD.

Although the United States Constitution does not require a state to charge by grand jury indictment, it does require that whatever charging document the state chooses must allege all facts essential to the punishment it seeks to impose.  *See, e.g.*, *Apprendi v. New Jersey*, 530 U.S. 466, 489-90 & n.15 (2000).  These essential facts include those necessary to impose the sentence of death.  *See Ring v. Arizona*, 536 U.S. 584, 604-05 (2002).  The Commonwealth unconstitutionally imposed a sentence of death upon Mr. Muhammad without charging the aggravating factors necessary to that sentence.

### *State court proceedings*

Muhammad sought to dismiss the indictments for capital murder against him as violating his federal constitutional rights to due process as announced in *Ring v. Arizona,* 536 U.S. 584 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), as the indictments did not include the aggravating factors, which are elements of death-eligible capital murder.  1 J.A. 283-90, 2 656-60, 8 3150-152.  The trial court denied Muhammad's motion after hearing argument by written order.  2 J.A. 740-41.  The Supreme Court of Virginia rejected the argument on its merits, holding that "Muhammad has no constitutional claim for failure to include aggravating factors in the two capital murder indictments because proceeding by indictment is not constitutionally required of the states."  619 S.E.2d at 39.

### *Argument*

Both ancient and modern authorities acknowledge that a charging document must allege all facts necessary to impose the relevant punishment on an accused.  In Virginia, these essential facts include at least one aggravating factor.  In this case, the Commonwealth failed to include

these elements in a charging document, and the trial court unconstitutionally imposed capital punishment.

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court extended the reasoning of *Jones v. United States*, 526 U.S. 227, 232, 243 n.6 (1999) to the states: "We there noted that 'under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.' The Fourteenth Amendment commands the same answer in this case involving a state statute." *Apprendi*, 530 U.S. at 476 (quoting *Jones*, 526 U.S. at 243 n.6). This rule was well-known in the 19th Century. *Apprendi*, 530 U.S. at 478 (quoting J. Archbold, Pleading and Evidence in Criminal Cases 44 (15th ed. 1862)); s*ee also, e.g.*, *Hodgson v. Vermont*, 168 U.S. 262 (1897); *United States v. Hess*, 124 U.S. 483, 486 (1888); *United States v. Carll*, 105 U.S. 611, 612 (1882); *United States v. Reese*, 92 U.S. 214, 232 (1876); *United States v. Cruikshank*, 92 U.S. 542, 558 (1875); *United States v. Cook*, 84 U.S. (17 Wall.) 168, 174 (1872); *The Schooner Hoppet & Cargo v. United States*, 11 U.S. (7 Cranch) 389, 394 (1813).

Justice Thomas's concurring opinion in *Apprendi* highlights the importance of alleging all elements of a crime in a charging document. In the opening paragraphs of the opinion, he notes, "In order for an accusation of a crime (whether by an indictment or some other form) to be proper under the common law, and thus proper under the codification of the common-law rights in the Fifth and Sixth Amendments, it must allege all elements of that crime." *Id.* at 500 (Thomas, J. concurring). A majority of the Court later adopted Justice Thomas's view that "'an accusation which lacks any particular fact which the law makes essential to the punishment is … no accusation within the requirements of the common law, and it is no accusation in reason.'"

59

*Blakely v. Washington*, 124 S. Ct. 2531, 2536 (2004) (quoting 1 J. Bishop, Criminal Procedure § 87, p. 55 (2d ed. 1872)).

Here, the Commonwealth's indictments failed to allege essential facts to a sentence of death under Virginia law.  The murder indictments did not allege either of the aggravating factors under Virginia law.   1 J.A. 1-2.  By imposing a sentence of death on the basis of an indictment which did not allege the aggravating factors, the Commonwealth of Virginia violated Mr. Muhammad's Fifth and Sixth Amendment rights.

The Supreme Court of Virginia's decision that the inapplicability of the Grand Jury Clause to the states defeated Mr. Muhammad's claim, 619 S.E.2d at 39, was contrary to and an unreasonable application of almost two hundred years of Supreme Court precedent.  Both the Due Process and Notice Clauses require the government to allege the essential elements of an offense in a charging document. The Grand Jury Clause, which is not applicable to the states, serves the same function in federal courts that Va. Code § 19.2-217 serves in Virginia: to specify the form, rather than the content, of the charging document. The Notice Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment require the government to allege a complete offense, including its essential elements, against a defendant. *See Schmuck v. United States*, 489 U.S. 705, 717-18 (1989); *Hamling v. United States*, 418 U.S. 87, 117-18 (1974); *Russell v. United States*, 369 U.S. 749 (1962); *Cole v. Arkansas*, 333 U.S. 196, 200 (1948); *DeJonge v. Oregon*, 299 U.S. 353, 362 (1937); *see also, e.g.*, *United States v. Maynie*, 257 F.3d 908, 920-21 (8th Cir. 2001) (explaining *Apprendi* indictment error as affecting both Fifth and Sixth Amendment rights). *But see Stroud v. Polk*, 466 F.3d 291, 295 (4th Cir. 2006); *Allen v. Lee*, 366 F.3d 319, 323-24 (4th Cir. 2004) (en banc); *Hartman v. Lee*, 283 F.3d 190, 194-

60

96 (4th Cir. 2002); *Wilson v. Lindler*, 995 F.2d 1256, 1263-64 (4th Cir. 1993) (Widener, J.,

dissenting), *rev'd*, 8 F.3d 173 (4th Cir. 1993) (en banc) (per curiam).

V. THE VIRGINIA TERRORISM STATUTES ARE UNCONSTITUTIONAL.

Mr. Muhammad's trial was the first applying three newly written statutes passed in

response to the terrorist attacks on September 11, 2001.  In 2002, the Virginia General Assembly

amended 18.2-31 by adding subsection 13 making a willful, deliberate, and premeditated killing

of any person "by another in the commission of or attempted commission of an act of terrorism

as defined in § 18.2-46" a capital offense.   Va. Code § 18.2-31(13).   The same year, the

legislature added Va. Code § 18.2-46.4 defining an act of terrorism as "an act of violence . . .

committed with the intent to (i) intimidate the civilian population at large; or (ii) influence the

conduct or activities of the government of the United States, a state or locality through

intimidation."  Va. Code § 18.2-46.4.  The legislature also amended Va. Code § 18.2-18, which

specifically exempts those who are principals in the second degree from receiving the death

penalty for a capital offense, to allow for the death penalty for "a killing pursuant to the direction

or order of one who is engaged in the commission of or attempted commission of an act of

terrorism under the provisions of Va. Code § 18.2-31(13)."  Va. Code § 18.2-18.

To shore up deficiencies in proof as to Mr. Muhammad's actual involvement in the

killing of Dean Myers under Va. Code 18.2-31(8), killing more than one person within three

years, the Commonwealth indicted him under the terrorism statutes, which are specifically

exempted from the limiting provisions of Va. Code 18.2-18.  These statutes are unconstitutional.

**A.  Virginia's terrorism statutes are unconstitutionally vague.**

*State court proceedings*

Mr. Muhammad argued to the trial court that Virginia's terrorism statutes were vague on their face and as applied.  2 J.A. 626-55, 8 J.A. 3010-49.  The trial court denied Petitioner's motion after hearing argument.  8 J.A. 3048-49.  Mr. Muhammad presented his argument that the statutes were facially vague to the Virginia Supreme Court.  F.H.A. 354-63.  The Supreme Court of Virginia rejected this argument on the merits, holding that the statute was not vague and that Mr. Muhammad did not have standing to mount a vagueness challenge because he engaged in clearly proscribed conduct.  619 S.E.2d at 42-44.

*Argument*

The Supreme Court of Virginia correctly recognized that a successful challenge to a statute "requires proof that the statute fails to provide notice sufficient for ordinary people to understand what conduct it prohibits, or proof that the statute 'may authorize and even encourage arbitrary and discriminatory enforcement.'"  619 S.E.2d at 42 (quoting *Chicago v. Morales*, 527 U.S. 41, 56 (1999)).  The Supreme Court of Virginia's error in applying *Parker v. Levy*, 417 U.S. 733, 756 (1974), arises from their failure to recognize that a law may be invalidated because vagueness in the notice and enforcement aspects of a law are independently sufficient to invalidate a law.  *See Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983).

In *Kolender*, the Supreme Court recognized that while the vagueness doctrine encompasses a notice requirement, the "more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine-the requirement that a legislature establish minimal guidelines to govern law enforcement.'"  461 U.S. at 357-58 (quoting *Smith*, 415 U.S. at 574).  Without such guidelines to govern law enforcement, then a criminal statute may "permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'"  *Id.* at 358 (quoting *Smith*, 415 U.S. at 575).  Therefore, when a

62

statute is so standardless that it encourages arbitrary and discriminatory enforcement, the only solution is to declare the statute unconstitutional as a violation of due process. *Kolender*, 461 U.S. at 357-58; *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964).

The terrorism statutes were susceptible to manipulation because they do not define what constitutes "terrorism" with sufficient particularity to provide notice and to prevent arbitrary and discriminatory enforcement.   Va. Code § 18.2-31(18) makes a killing while attempting or committing an act of terrorism a capital offense as defined by 18.2-46.4.  Va. Code § 18.2-46.4, in turn, requires the intent to "(i) intimidate the civilian population at large, or (ii) influence the conduct or activities of the government of the United States, a state or locality through intimidation."  No portion of the Virginia Code defines "intimidate," "the civilian population," "at large," "influence the conduct or activities of the government of the United States, a state or locality," "through intimidation."  Such standardless and confusing phrases and terms do nothing to limit the discretion of the prosecutors and police when deciding when to charge a murder defendant under the terrorism prong of the capital murder statute.

The shortcomings of the statute become more apparent when compared to other capital murder subsections.  Virginia only allows the death penalty to be sought in specific sets of circumstances.   Virginia Code § 18.2-31 allows for the death penalty when a willful, premeditated killing occurs in the course of a specified crime.  It also allows for the death penalty in particular fact scenarios such as the killing of a pregnant woman, a police officer, a judicial officer, or a witness.   These well-defined circumstances stand in sharp contrast to the standardless crime provided by § 18.2-46.4.

Va. Code 18.2-18's exception to the triggerman rule suffers from the same infirmity as § 18.2-31(13) because it relies upon the vague definition of terrorism in Va. Code § 46.2-4.  It is

further compromised because it does not define "direction" or "order" as used in the terrorism context. *See* Va. Code 18.2-18.  In fact, nowhere in the code are these phrases defined.

The Supreme Court of Virginia's decision that Virginia's terrorism statutes are constitutional is contrary to and an unreasonable application of firmly established Supreme Court precedent.  The Supreme Court of Virginia's reliance on *Parker v. Levy*, 417 U.S. 733 (1974), is misplaced, as it is primarily a notice case, not an enforcement case.  As the Court made clear in *Kolender*¸ the notice and enforcement requirements are separate inquiries.  461 U.S. at 357-58. Therefore, the fact that particular conduct is clearly proscribed, *i.e.*, the person has notice that the statute applies to him, does not foreclose the inquiry into the statute's propensity for abuse by the state.

### B.  Section 18.2-31(13) is unconstitutional because it provides for a penalty of death in cases without proof of an intent to kill.

*State court proceedings*

Muhammad argued to the trial court that the prosecution under the terrorism statute violated his Fifth and Eighth amendment rights because it discards the requirement that he share the killer's intent to employ lethal force.  2 J.A. 652-53.  Mr. Muhammad argued to the trial court and to the Supreme Court of Virginia that the statute was unconstitutional because it allows the death penalty to be imposed even where the defendant did not intend there to be a death as required by *Enmunds v. Florida*, 458 U.S. 782 (1982).  2 J.A. 652-53, F.H.A. 362-63.  The Supreme Court of Virginia rejected this argument on the merits, holding that the statute is not unconstitutional because whoever "orders" or "directs" the killing shares the intent to kill with the one who carries out the murder.  619 S.E.2d at 44.

*Argument*

64

In *Enmunds*, 458 U.S. 782, the Supreme Court reversed a death sentence for the getaway driver in an armed robbery.  The occupants of the house were robbed and killed by the others involved in the robbery.  The Supreme Court held that Enmunds' participation was so tangential that it cannot justify a sentence of death.  The Court noted that deterrence rationale for the death penalty cannot be served in cases where "one does not kill and has no intention or purpose that life will be taken."  *Id.* at 798-99.

Similarly, in the present case, the terrorism statutes impermissibly expand the net of those who can be charged and convicted of a capital offense.  Virginia Code § 18.2-31 contains no requirement that an aider and abettor share the killer's intent to employ lethal force, or even that he be aware of the murder at all.  The statutes expand the application of the death penalty to persons that may be involved in a terrorist scheme or plot but are unaware that the act will result in the loss of life.  The unconstitutional breadth of the aiding and abetting provisions void Mr. Muhammad's conviction because the Commonwealth relied on aiding and abetting as an alternate theory of guilt.  The Supreme Court of Virginia's decision was contrary to and an unreasonable application of *Enmunds* and its progeny.

**C.  The terrorism statutes make it impossible to empanel an impartial jury.**

*State court proceedings*

Muhammad argued to the trial court that it was impossible to empanel an impartial jury on the terrorism charges because the statute plainly includes the individual jury members as victims of the offense.  2 J.A. 591-601.  The Commonwealth presented testimony from numerous witnesses about the fear and the impact Petitioner's alleged crime spree had on them.  Mr. Muhammad argued to the trial court that, because the statute drew within its reach as victims the entire population of the county, then it was impossible to empanel an impartial jury to decide his

case.  The trial court heard argument on the motion and ultimately denied it by written order.  2 J.A. 731, 8 J.A. 3113-3126.  Mr. Muhammad presented the same argument to the Supreme Court of Virginia.  F.H.A. 389-93.  The Supreme Court of Virginia rejected this argument on the merits, holding that the jury members were not victims as contemplated in the statute.  619 S.E.2d at 51.

*Argument*

The Supreme Court's resolution of this issue, merely holding that the jury members were not victims of the statute, ignores the plain language of the statute.  The jury was drawn from the "civilian population at large."  In order to be convicted, the Commonwealth had to show that Mr. Muhammad intimidated "the civilian population at large."  During trial, the jury was repeatedly told that they were victims.  During closing argument, the Commonwealth told the jury, "Any form of terrorism is evil, folks.  And we are in a war on terrorism, and it's not just abroad.  It's right here at home.  It's right here at home."  19 J.A. 8830.  The Commonwealth also presented a map of the Tidewater area, where the case was tried, seized at the time of Mr. Muhammad's arrest that depicted the area with markers implying that the Tidewater area was also targeted.  17 JA 7761-76; 20 J.A. 9363-73.  It is clear that the statute encompasses any potential jury member as a victim in the case and the way that the case was tried also demonstrated that the prosecutors used this perception to their advantage.  Therefore, the terrorism statute, as written, violated Mr. Muhammad's fundamental right to be tried by an impartial jury.  *See Irvin v. Dowd*, 366 U.S. 717, 727 (1961) (vacating petitioner's conviction after the Court found a "pattern of deep and bitter prejudice" shown to be present throughout the community from which the jury was drawn).  The Supreme Court of Virginia's decision was contrary to and an unreasonable application of Supreme Court precedent.

## VI.  THE COMMONWEALTH UNCONSTITUTIONALLY WITHHELD MATERIAL, EXCULPATORY EVIDENCE FROM MR. MUHAMMAD.

The Commonwealth violated Mr. Muhammad's rights under *Brady v. Maryland*, 373 U.S. 81 (1963), in multiple instances.  Eighteen months prior to the start of trial, Mr. Muhammad filed a Motion for Exculpatory Evidence in which he requested discovery of information possessed by all investigative agencies that were part of the "task force" investigating the alleged crimes.  1 J.A. 42-49.   In gross violation of Mr. Muhammad's constitutional rights, the Commonwealth repeatedly breached Mr. Muhammad's rights to due process and a fair trial under the Fifth and Fourteenth Amendments by withholding exculpatory evidence from him, as detailed below.  Mr. Muhammad did not receive the evidence in question until years after he was convicted and sentenced to death in Virginia when, approximately one month prior to filing Mr. Muhammad's state habeas petition, state habeas counsel fortuitously received from Mr. Muhammad's Maryland attorney a DVD disc containing approximately 30,000 new pages of discovery that was never turned over in the Virginia case.  F.H.A. 1415-16; see Maryland Discovery Disk.   These approximately 30,000 pages of jumbled documents were in the possession of the same multi-jurisdiction joint investigation which supplied evidence in Mr. Muhammad's Virginia case.   Because these violations substantially contributed to Mr. Muhammad's guilt and death verdict, his right to be free from cruel and unusual punishment under the Eight Amendment was also violated.

*Sniper "Team" Evidence*

The Commonwealth failed to provide to Mr. Muhammad exculpatory evidence that would have undermined the Commonwealth's theory that two people are necessary triggermen for a sniper shooting (both the actual shooter and the shooter's spotter) and would have tended to

prove that one offender, rather than two, committed some or all of the killings.  When the trial court allowed Mr. Muhammad to represent himself at trial, the Commonwealth quickly re-ordered their witness list and called as a surprise witness Sgt. Major Spicer.  Spicer testified concerning his theory that a "sniper team" was responsible for the killings because one person could not have accomplished the shootings.  12 J.A. 5327-413.

Spicer's testimony helped link Mr. Muhammad to all the killings in this case because there was little or no direct evidence linking Mr. Muhammad to the shootings.  For example, Spicer's testimony was key to linking Mr. Muhammad to the killing of Pascal Charlot in D.C.  The Commonwealth had no direct evidence of Mr. Muhammad's involvement, but presented evidence that the Chevy Caprice was seen at the scene and that the Bushmaster rifle was used to kill the victim, but relied on Spicer's theory to infer Mr. Muhammad's involvement and his responsibility as a triggerman despite no evidence that Mr. Muhammad fired a shot.  Spicer's testimony also strengthened the Commonwealth's case for the other killings in this case, and that Mr. Muhammad was guilty of capital murder.  19 J.A. 8777-80, 8823-25, 18 J.A. 8447-53.

The Commonwealth suppressed an FBI criminal analysis that stated: "There is likely only one offender.  Sniper attacks are generally a solitary type of murder.  It would be extremely unusual for there to be multiple offenders involved in this series of attacks."  F.H.A. 772.  If this opinion were disclosed to Mr. Muhammad, he would have been able to call the author as a witness to rebut Spicer's damning testimony.

*Montgomery, Alabama*

Claudine Parker's killing was used as one of the predicate killings for the capital charges under Va. Code 18.2-31(8) and as support for the death penalty.  The prosecution's case against Mr. Muhammad for the Parker shooting was weak and circumstantial.  Various witnesses

testified regarding Parker's shooting and many of them either contradicted each other's description of the clothing the lone assailant wore, *compare* 13 J.A. 5949-50 *with* 13 J.A. 5949, 6004-6012, or were unable to identify the assailant. 13 J.A. 5976. Detective Lindsay testified that he heard the shots, 13 J.A. 5963, and moments later saw a young black male with a handgun going through a purse.   13 J.A. 5963-64.   James Gray, cross-examined vigorously on his identification of the shooter, 13 J.A. 6004-12, identified the young man in court as Mr. Malvo. 13 J.A. 5985-93. Lieutenant James Graboys testified that he chased the suspect over a fence, 13 J.A. 6054, and described yet another set of clothes the suspect supposedly wore. *Id.*   Graboys then identified Mr. Malvo from a photograph shown to him in court. 13 J.A. 6062-63.   Mr. Malvo's fingerprint was found on a magazine near the scene of the crime.

The only evidence that arguably implicated Mr. Muhammad was that the medical examiner testified that the lone bullet that killed the victim fragmented in a lead "snowstorm" pattern, which, she testified, is typical of bullets fired from high powered rifles.  13 J.A. 6042. And Joe Saloom, the Alabama Department of Forensic Sciences firearms examiner, testified that the bullet recovered from Parker's body was shot from the .223 Bushmaster found in Mr. Muhammad's car. 17 J.A. 8020-21.  There was no other evidence that linked Mr. Muhammad to this crime.

In fact, the Commonwealth suppressed the following key facts:

Officer D.L. Johnson came upon the scene of the crime as it happened with Detective Lindsay, and stated in a report that he heard the gunshots coming from the side of the ABC store, where the suspect later identified as Mr. Malvo was supposedly standing with a handgun. F.H.A. 1262-63.  Interestingly Johnson was unknown to Mr. Muhammad at the time of trial, but was one of the only officers to give a statement to police investigators within the days after the shooting

of Parker.  And Lt. Graboys, who did testify, did not give a statement to police until after the

Montgomery police had developed Mr. Muhammad and Mr. Malvo as suspects.  F.H.A. 1313.

Clyde Wilson, who chased the suspect along with James Gray, stated that prior to the

chase he heard the first shot, then he looked and saw the suspect (where Malvo was supposedly

standing) raising his hand as if to point a gun, and then heard the second shot come from that

suspect.  F.H.A. 1275, 1278.

Cecil Milstead told police that he was in the parking lot next to the ABC store when he

saw a flash and heard a shot.  F.H.A. 1299.  Milstead looked at the ABC store, saw the suspect

(supposedly Malvo) and saw another flash and heard another shot.  *Id.*  Milstead stated that the

two shots and the muzzle flashes were coming from right in front of the ABC store, where Malvo

was standing.  *Id.*

Prior to the identification of Mr. Muhammad as a suspect forensics experts believed that

the victim was killed with .22 caliber bullet, likely from a handgun, and not a bushmaster rifle.

On September 24, ballistics expert Mr. Saloom contacted Detective Myrick regarding his

findings about the ballistics investigation.  F.H.A. 1270-71.  Myrick's report dated September

27, 2002 at 7:30 a.m. states in part:

> Mr. Sloom contacted the Detective Division with his findings regarding
> the analysis of the projectile.  Mr. Sloom advised that the projectile was a .22
> magnum and was a very specific caliber and could be liked to only a few
> weapons.  In regards to a handgun, the likely weapons would be a High Hunter
> revolver, which is a western style handgun with a six round cylinder.  A second
> possible handgun would be the Haws western style derringer handgun.  Mr.
> Sloom also advised that three rifle combinations were likely, these weapons were
> very old and unique style of weapons.  The first was a Springfield Model 6, the
> second was a Winchester Model 141 or 225, and the third was a Remington
> Model 16.
> Mr. Sloom advised that the projectile itself was possibly too damaged to
> compare to a known weapon in a test fire analysis; however, Mr. Sloom advised
> that the number of shots fired at the scene will likely determine what type of

70

weapon was used.  Due to the fact that no casings were recovered and that only two shots were heard, the High Hunter revolver and the Haws western style derringer are the likely weapons used in this offense.

F.H.A. 1270-71.

It was not until Mr. Muhammad was apprehended on October 24, 2002 that the opinion of Saloom changed, and he suddenly found that he could make a definitive analysis of the bullet fragments.  F.H.A. 1311.  Still, the Montgomery County police chief apparently had information sufficient for him to make public statements that the gun used in the Parker killing was not the same one (Bushmaster .223) used in the Washington D.C. area "sniper" shootings.  F.H.A. 1272.

A few hours after Saloom reported the ballistics match, Paula Mims and Sherri Fowler found a .22 handgun in an area where police had earlier chased the suspect who shot Parker and Adams.  F.H.A. 1292.  That gun was recovered by Officer A.R. Rogers and was taken to police headquarters.  F.H.A. 1292.  Obviously concerned about this development, Lt. Gantt called Saloom to inquire about the possibility that the gun they found was the actual murder weapon.  F.H.A. 1312.  Saloom disqualified the .22 caliber as the gun that killed Parker without examining the weapon because he had already identified the bullet as coming from the Bushmaster rifle.  F.H.A. 1312.

It is uncontroverted that the evidence detailed above was never provided to counsel.  It is also clearly exculpatory.  Considering that the Commonwealth's case against Mr. Muhammad for the Parker murder relied on weak inferences, this Brady evidence would have provided devastating material to contradict the Commonwealth's already weak guilt case at trial.

*Washington, D.C.*

Pascal Charlot's killing was used as one of the predicate killings for the capital charges under Va. Code 18.2-31(8).  The prosecution also used the killing to bolster its capital case under

71

the terrorism statute and to argue that Mr. Muhammad was a principal in the first degree and deserved the death penalty.  13 J.A. 5942-58, 6033-44. Like the Alabama shooting of Parker, the Commonwealth attempted to show Mr. Muhammad was involved in the D.C. shooting by circumstantial evidence.

Two witnesses testified that they saw a car fitting the description of Muhammad's Chevy Caprice leaving the scene across the street and some distance from the victim of the shooting: Gail Howard identified the Chevy Caprice and stated she told this to an Officer the day after the shooting, and Karl Largie said the car was "dark" and a Chevy Caprice.  14 J.A. 6626-30, 6651-57.  A witness testified that he saw a flash of light coming from the direction where Howard and Largie saw the caprice.  14 J.A. 6585-86.  A D.C. police officer testified that he stopped Mr. Muhammad in the Chevy caprice two hours prior to the shooting.  14 J.A. 6696.  And again the medical examiner testified that the fragments of bullet found in the victim showed a lead "snowstorm" pattern, which, she testified, is typical of bullets fired from hire powered rifles.  14 6687-88.

The Commonwealth suppressed the fact that the only witness who positively identified Mr. Muhammad's car, Howard, had previously stated she could not identify his car, F.H.A. 863-64, had not spoken to the police until weeks after the shooting contrary to her testimony, F.H.A. 844, and that the D.C. police had written letters to the Immigration and Naturalization Service on Howard's behalf.  F.H.A. 854-855.

Also unknown to Mr. Muhammad was that all the witnesses, seven of them, who had provided a description to investigating officers within hours of the shooting tended to show that a handgun was used to kill Charlot at close range.  Officer Bolding interviewed Constantine Aldakkour, who reported that he heard two shots come from close to where Charlot fell.  F.H.A.

836.   Officer Ward interviewed Ayman Gomma, who reported that the shots came from near where Charlot fell, and that from his military experience the two shots were from a handgun. F.H.A. 837-38.  Officer Blue interviewed Leonard Hughes who heard the gunshot, and then saw a burgundy Nissan Maxima speed away from right in front of Charlot.  F.H.A. 839-40.  Officer Broadbent interviewed Grant Johnson who heard a shot, and saw two cars, neither the Chevy caprice, close to Charlot and speed away.   F.H.A. 841-42.   Officer Lonon interviewed John Vanderhoof who saw a slight puff of smoke as he heard two shots coming from a car very near to Charlot.  F.H.A. 849.  Officer Arrington interviewed Heidi Mansen who heard a shot and saw a puff of smoke just in front of Charlot as he fell.  F.H.A. 856.  She then saw a Toyota Camry of Maxima speed away.  Officer Redd interviewed Mansen's father, Derwood Schrotenberger, who corroborated his daughter's version of events.  F.H.A. 860.

This exculpatory evidence would have been devastating for the Commonwealth's case – one of its two witnesses would have been impeached, and seven witnesses could have testified to a contrary and exculpatory set of facts.   Clearly had Mr. Muhammad been provided these statements he would have completely undermined the Commonwealth's case against him in this shooting.

### Baton Rouge, Louisiana

Hong Im Ballenger's killing in Baton Rouge, Louisiana was used as one of the predicate killings for the capital charges under Va. Code 18.2-31(8).  The prosecution also used the killing to bolster its capital case under the terrorism statute and to argue that Mr. Muhammad was a principal in the first degree and deserved the death penalty.  13 J.A. 5942-58, 6033-44.

Ingrid Shaw identified Mr. Malvo as the person she saw running from the scene of the shooting with a purse and handgun.  She also identified Mr. Muhammad's Chevy Caprice as the

same car Mr. Malvo got in near the scene of the shooting.  14 J.A. 6221-22.  Unknown to Mr. Muhammad until he received the Maryland discovery was that when first interviewed Shaw did not mention seeing a car parked nearby or picking up the fleeing suspect.  F.H.A. 786-91.  She did not mention that car in two other subsequent interviews.  She told the police the car could be an "Olds Cutlass" and gave a Louisiana tag number to the police, which came back to a 1979 Ford LTD.  *Id.*

*Ballistics Evidence*

The Commonwealth presented ballistics evidence which tended to show that, *inter alia*, the Alabama Parker shooting and the Washington D.C. Charlot shooting were connected to the Bushmaster .223 rifle found in Mr. Muhammad's car upon his arrest.  This was done via two methods: a) the medical examiner in the above shootings testified that the bullet fragmentation in the victims was a lead "snowstorm" effect consistent with a high-powered rifle; and b) a firearms examiner testified that the tiny fragments of bullets recovered from the victims in the above shootings matched a bullet test-fired from the Bushmaster .223 recovered from Mr. Muhammad's car.

The medical examiners' claims that a fragmented bullet signifies a lead "snowstorm" effect and the use of a high powered rifle has little or no grounding in science.  The use of the term lead "snowstorm" by multiple medical examiners in this case is a suspicious rhetorical flourish that may be prejudicial, but adds nothing to the analysis.  This rhetorical flourish neither appears as a term of art in any other reported case, nor was shared by other medical examiners who testified in this case about shootings with fragmented bullets, where the link to the Bushmaster .223 was not so critical because of other evidence.  *See* 13 J.A. 6166; 14 J.A. 6516; 15 J.A. 6909-10; 15 J.A. 7003; 15 J.A. 7230.

74

The firearms examiner in this case testified that such ballistics examination is "an art and science."  17 J.A. 7997. What the Commonwealth suppressed, and their firearms examiners did not testify to, are the several examples that illustrated the predominance of the art over the science in this case.  Officer Fagler of the Atlanta Police reported on November 11, 2002, that "Agent McCoy advised that the 22 rounds recovered from the shootings on September 5th in Clinton MD and September 14th in Silver Springs MD were to [sic] badly damaged to make a conclusive match.  They are matching these cases on M.O. only."  F.H.A. 1305.  On November 15, 2002, Prince George's County Police Department firearm examiner Alan Jackson reported that the handgun recovered from the Alabama shooting was test fired but that there were "insufficient marks to determine if [this revolver] fired the bullets recovered in both robberies." (referring to the Maryland and Alabama robberies).  F.H.A. 1307.  And in a December 3, 2002, report Lieutenant Gantt reports that "SA Margaret Faulkner . . . advised that the preliminary findings of the ballistics are inconclusive.  Meaning that they were comparing shell fragments to shell fragments, and that no positive comparison could be made at this time."  F.H.A. 1309-10.  Further, the "science" of ballistics evidence has been called into question recently as so unreliable that it should be inadmissible under *Daubert*. *See, e.g.*, *United States v. Monteiro*, 407 F. Supp. 2d 351 (D. Mass. 2006).

## Pac-Man letters

The Commonwealth also violated Mr. Muhammad's due process rights by failing to disclose information that tended to show that Mr. Muhammad did not direct or control Malvo. To be eligible for the death penalty under the exception to the triggerman rule to Va. Code § 18.2-31(13) or as a triggerman under § 18.2-31(8), the Commonwealth had to prove that Mr. Malvo's acts were directed or ordered by Mr. Muhammad. From voir dire, 9 J.A. 4235, 4883, to

the presentation of evidence, (Charlene Anderson, 14 J.A. 6265-81; Reverend Al Archer, 18 J.A. 8163-92; Maria Dancy, 18 J.A. 8324-30; Robert Holmes, 18 J.A. 8235-50), to its closing arguments, 19 J.A. 8925; 19 J.A. 8926-29; 19 J.A. 8938, the Commonwealth pressed the theme that Mr. Muhammad lead, directed, and ordered Mr. Malvo.

After Muhammad's trial, counsel fortuitously discovered twelve letters written by Mr. Malvo to another inmate, nicknamed "Pac-Man" (allegedly Milton Jurado).  Those letters contradicted the Commonwealth's position in Mr. Muhammad's trial that Malvo was a meek, malleable young man who only did what he was told by Mr. Muhammad.  6 J.A. 2266-83.

Mr. Malvo's defense strategy during his trial was to argue that he had been "brainwashed" and controlled by Mr. Muhammad.  6 J.A. 2264-65. In response, the prosecution introduced the Pac-Man letters to buttress the opinion of their expert that Mr. Malvo was in control of his actions.  6 J.A. 2226-59. The Pac-Man letters are exculpatory because they portrayed Mr. Malvo as having complete control and understanding of his actions and thoughts. The letters demonstrate that throughout the months after Mr. Malvo's arrest on October 24, 2002, he continued to operate in an independent, thoughtful and intentional manner, just as he had done during the course of his alleged involvement in the shootings in question.  In fact, Mr. Malvo gives advice to Pac-Man as to how he conducts his own affairs and how Pac-Man should conduct his affairs, free from the influence of others.  6 J.A. 2245-56.  The Pac-Man letters' materiality is shown by the effectiveness in which they operated to rebut Mr. Malvo's claims in his trial.  6 J.A. 2266-83.

After discovering the Pac-Man letters, counsel for Mr. Muhammad filed a Motion for Entry of Post-Trial Brady Order and to Dismiss Convictions Herein Notwithstanding the Verdict, or, in the Alternative, for a New Trial, 6 J.A. 2213-2214, which focused on the exculpatory

nature of the Pac-Man letters, particularly as impeachment to the Commonwealth's theory of the case, and a Motion for a New Trial based upon after-discovered evidence. Both motions were denied.  6 J.A. 2226-59.

The letters showing Mr. Malvo's independence would have put Mr. Muhammad's case in a different light and would have allowed Mr. Muhammad to defend against the Commonwealth's triggerman theory of control and direction of Mr. Malvo by Mr. Muhammad.  The letters are also relevant to punishment, because they shift more of the relative culpability of the alleged co-conspirators to Mr. Malvo than was presented during Mr. Muhammad's trial.  Thus the letters were material to both guilt and punishment. *Kyles v. Whitley*, 514 U. S. 419 (1995).

The finding by the Supreme Court of Virginia that the letters "were not exculpatory," "not likely admissible," cumulative and not material, is an unreasonable finding of fact or contrary to or an unreasonable application of federal law.  Clearly the letters would have been admissible as a statement against penal interest, just as they were admissible in Mr. Malvo's trial.  And the letters obviously go to the core issue in Mr. Muhammad's trial – his culpability for shootings for which the Commonwealth had no direct evidence that he fired a shot.

*Cumulative materiality*

All the illegally withheld evidence above is material because there is a reasonable probability it would have had an effect on the jury verdicts regarding guilt and punishment.  *See Banks v. Dretke*, 540 U.S. 668, 701 (2004); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  Materiality is determined by the cumulative effect of the withheld evidence.  *Kyles*, 514 U.S. at 436-37.  The withheld evidence could have been used not only to attack the probative value of crucial evidence that was the linchpin to the Commonwealth's case in these individual shootings, for example, that Mr. Muhammad participated in the Alabama shooting because the shooting

77

occurred using the Bushmaster .223 rifle found in his car, but the evidence in each example above could have been used to attack the "thoroughness and even the good faith of the [entire] investigation." *Id.* at 445.  And the fact that there was evidence regarding other shootings (ten shootings in total) relevant to § 18.2-31(8) is of no import to the materiality of Mr. Muhammad's *Brady* claim because, as the trial court stated, "we don't know which-if any or if all the jury felt were victims in this case."  19 J.A. 9006.  Thus if Muhammad undermines the confidence in any of the shootings used to prove § 18.2-31(8) his conviction cannot stand.

The state court resolution of Muhammad's claims was an unreasonable determination of the facts and contrary to or an unreasonable application of federal law because it resolved disputed facts in favor of the Commonwealth without holding an evidentiary hearing and based on no grounds whatsoever, and it failed to follow *Kyles* and *Brady* and its progeny.

CONCLUSION AND PRAYER FOR RELIEF

For the aforementioned reasons, Mr. Muhammad hereby prays this Court to grant him the following relief:

1. Issue a writ of habeas corpus that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death.

2. Grant him expert assistance, the right to discovery, and an evidentiary hearing at which he may present evidence in support of these claims.

3. Direct that under Habeas Corpus Rule 7 the record in this case be expanded to include the "additional materials relevant to the determination of the merits of the petition" which are found in the Federal Habeas Appendix, to the extent that they are not already contained in the record.

4. Grant such other relief as law and justice require.

Pursuant to 28 U.S.C. § 2242, we sign and verify this petition on behalf of John Allen Muhammad.

Respectfully submitted,

JOHN ALLEN MUHAMMAD


_____/s/_____
James G. Connell, III
VSB No. 40790
Devine, Connell & Sheldon, P.L.C.
Counsel for John Allen Muhammad
10621 Jones Street
Suite 301A
Fairfax, VA 22030
(O) (703) 691-8410
(M) (703) 623-8410
(F) (703) 251-0757
jgc3@devineconnell.com


Jonathan P. Sheldon
VSB No. 66726
Devine, Connell & Sheldon, P.L.C.
Counsel for John Allen Muhammad
10621 Jones Street
Suite 301A
Fairfax, VA 22030
(O) (703) 691-8410
(M) (703) 635-4164
(F) (703) 251-0757
jsheldon@devineconnell.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of April, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

> Katherine P. Baldwin
> Office of the Attorney General
> 900 East Main Street
> Richmond, VA 23219
> (804) 786-2071
> kbaldwin@oag.state.va.us

> _____/s/_____
> James G. Connell, III
> VSB No. 40790
> Devine, Connell & Sheldon, P.L.C.
> Counsel for John Allen Muhammad
> 10621 Jones Street
> Suite 301A
> Fairfax, VA 22030
> (O) (703) 691-8410
> (M) (703) 623-8410
> (F) (703) 251-0757
> jgc3@devineconnell.com